RAY D. LOWDER, INC. v. NORTH CAROLINA STATE HIGHWAY COMMISSION

No. 7510SC95

(Filed 6 August 1975)

1. **Highways and Cartways § 9— highway construction contract — inaccurate information as basis for bid — cost overrun**

    Provisions of a highway construction contract stating "There is no subsurface information available on this project except as may be shown in the plans" and requiring the contractor to make his own investigation of the subsurface conditions do not place on the contractor the loss occasioned by an unexpected amount of undercut excavation far in excess of that estimated in the contract since (1) a contracting agency which furnishes inaccurate information as a basis for bids may be liable on a breach of warranty theory and (2) instructions to bidders to make their own independent investigations of the conditions to be encountered cannot be given full literal reach.

2. **Highways and Cartways § 9— highway construction — overrun in undercut — changed condition**

    A highway construction contractor is entitled to an equitable adjustment in the contract price for additional costs incurred by reason of a large overrun in undercut excavation occasioned by unexpected and excessive wetness under the contract provisions governing "Alterations of Plans or Character of Work" and is not limited to recovery under contract provisions relating to "Overruns and Underruns."

3. **Evidence § 29— admissibility of business records**

   Business entries are recognized as an exception to the hearsay rule provided the entries (1) are made in the regular course of business, (2) are made contemporaneously with the events recorded, (3) are original entries, and (4) are based upon the personal knowledge of the person making them.

4. **Evidence § 29— compilation of costs — inadmissibility as business record**

   A report purportedly compiling the costs incurred as a result of an overrun of undercut excavation was not admissible under the business records exception to the hearsay rule because it was not made in the regular course of business and contemporaneously with the events recorded where the report was prepared for use in litigation rather than for routine operation of the business, and it was based on incomplete daily reports and the preparer's personal judgment, discretion and memory some four years after the events occurred.

APPEAL by defendant from *Bailey, Judge*. Judgment entered 1 October 1974 in Superior Court, WAKE County. Heard in the Court of Appeals 15 April 1975.

Plaintiff Ray D. Lowder, Inc. (hereinafter referred to as Lowder), is a North Carolina corporation doing business as a grading and utility contractor. Defendant North Carolina State Highway Commission (now Department of Transportation; hereinafter referred to as Commission) was authorized by G.S. 136-28 to let contracts for the construction of highways in North Carolina. On 2 March 1965 and again on 16 March 1965 the Commission advertised for bids for the construction of project 8.11618, a portion of Interstate 95 located in Nash County, North Carolina. Lowder submitted a low bid of $1,040,418.21 and was awarded the contract on 1 April 1965. Both parties executed the contract on 20 April 1965. Lowder began construction on 5 May 1965, and completion was scheduled for 1 October 1966.

This litigation arises out of an overrun of the contract estimate of roadbed undercut requirements. Item 22B of the itemized proposals, a part of the contract, called for the removal of 12,000 cubic yards of undercut excavation. Lowder submitted a unit price bid of fifty cents (50¢) per cubic yard for this excavation. However, it soon became apparent that the removal of a greater quantity of undercut excavation would be necessary to complete the project. By the time the project was accepted by the Commission on 28 March 1967, some six months behind schedule, Lowder had removed 259,729 cubic yards of undercut

excavation. This amounted to a 2,064.58 percent overrun in the amount of undercut excavation and a 29.7 percent overrun of the entire contract.

The central questions raised by this appeal are (1) whether Lowder has a right under the contract to recover an additional sum for the overrun over and above the amount paid to it by the Commission at the unit bid price, and, (2) if so, whether Lowder offered competent evidence to establish that additional sum for which it recovered judgment in the trial court.

Operating under one provision of the contract governing "Overruns and Underruns," the Commission paid Lowder the sum of $129,504.74 for the overrun in undercut excavation. This constituted payment at the contract unit price of fifty cents (50¢) per cubic yard. Lowder contends that a provision of the contract governing "Alteration of Plans or Character of Work" controls the issue and entitles it to an "equitable adjustment" of the contract price in the amount of $351,377.09. After the project was accepted by the Commission, Lowder filed a verified claim for this additional compensation. The claim was denied "in its entirety." Lowder subsequently instituted an action in superior court in Wake County. The trial judge made extensive findings of fact and concluded that Lowder was entitled to additional compensation in the amount of $351,377.09.

In order to grasp fully the issues engendered by this appeal, it is necessary to examine in detail the facts surrounding the construction of project 8.11618. Undercut excavation is defined by the contract as "material which is located below a plane parallel to and one foot below the top surface of the roadway grading template and extending to the side slopes." Generally the removal of undercut excavation is designed to prepare the roadway for support of the "coarse aggregate base course," i.e., crushed stone used as a part of the roadway base to support pavement.

Undercut excavation may be removed by several methods. Lowder chose to use the dragline method to do the excavation. Its president, Clyde Huneycutt, stated that "[t]he most expensive method is dragline as far as I know. So when we bid the project, we took into consideration the most expensive way of removing undercut excavation." Lowder owned three draglines. Under ideal conditions one machine can remove approximately 1,000 cubic yards of undercut excavation during a ten-hour day.

These facts were taken into consideration in preparation of the bid.

Lowder also found it necessary to examine the project site before placing its bid. A report of the subsurface soil conditions had been prepared by the Commission's geologists in 1963 for project 8.11618. Boring samples were taken at two to three hundred foot intervals along the centerline of survey for the length of the project. The report was prepared chiefly to give the Commission's Roadway Design Department an indication of the subsurface soil conditions, but, more specifically, was designed to locate all wet cuts (a cut having water within six feet of the grade) and to determine the suitability of excavated soils for later use in the project. Albert Dodson, a geologist employed with the Commission, stated that there was no estimate of the quantity of undercut in the report: "That would be left up to the Roadway Design Department. They would take this profile and make a determination as to how much undercut." Dodson stated that the geologists could determine the limits of the undercut, but the Design Department could better determine the amount.

The 1963 report is important to this litigation in that it was never made available to Lowder. Had Lowder officials seen the report prior to submission of the bid, then it is asserted that Lowder either would not have made a unit price bid for undercut excavation of fifty cents (50¢) per cubic yard, or would not have bid the project. Lowder's president testified that the report

"seems to have some information that would have been helpful to me when I bid for the job. It is talking about undercut, when—the weather conditions, undercut and backfilling, soil types, ground-water conditions. This information would have helped very much in making the bid per unit for undercut excavation. It would have affected the amount of our bid per cubic yard for undercut excavation. It would have caused us to bid a higher price."

The facts indicate that the report was not intended to portray permanent subsurface soil conditions at project 8.11618. Dodson "emphasized that our report and our recommendations are based on the conditions at that time in the several weeks preceding September 11 [the date of the report]." The report states that "the country side was unusually dry from the lack

of summer rains. As evidence of the dry weather, the swamps were dry and many of the streams and man-made ponds were also dry."

The importance of the report to Lowder is said to be underscored by the proviso found on page 2 of the project special provisions:

"*Subsurface Information:* There is no subsurface information available on this project except as may be shown in the plans. The contractor shall make his own investigation of the subsurface conditions."

To comply with this requirement and to acquaint themselves with the site of the project, Lowder officials went to Nash County and "walked the project": "The plans showed two or three places, different places on the plans, that they were calling for undercut excavation. We went to these places and looked at those particularly good. From looking at the site and walking over it, we felt like the 12,000 cubic yards estimated on the proposal for undercut excavation was about what should be there." On cross-examination Clyde Huneycutt, president of Lowder, elaborated on this testimony:

"[W]e located the areas shown on the plans and they were a center line run, there was some center line stakes in with stations on them. We went to these three areas and noticed the undercut excavation. We could not necessarily tell that it was going to have to be undercut by knowing the grade, but the low places and as of that time I don't recall exactly how wet that it was, but it looked like that it would need some undercutting. We could not tell by looking at the project how much it would need. There was no way. We did not conduct any sub-surface investigation."

Grady Meisenheimer, Lowder's superintendent on the project, stated that when he first walked the project, he "noticed the swampy areas. . . . It was just like the plans showed it, those two [swampy areas] that was real bad, but the rest of it, I mean, it looked just like any other ground." The need to undercut this was not apparent from mere observation. Meisenheimer concluded: "I don't believe I have, at any other time in my experience in grading, come across situations where I encountered undercut but (sic) I could not tell it just by looking. You can usually tell pretty well where you are going to have to take it out."

In finding of fact 12 the trial judge found

"[t]hat subsequent to the advertisement of said project by the Defendant and prior to formulating its bid for the construction of said project, the Plaintiff conducted a reasonable independent examination of the entire area of the said project, including a reasonable investigation of the subsurface conditions thereof."

It was not immediately apparent, once Lowder began construction, that there would be a vast overrun in the quantity of undercut excavation. For the first sixty days of construction, no undercut excavation was removed. This was attributable to Lowder's beginning its operations in an area of high ground that necessitated a considerable amount of grading *down* to the roadbed.

In spite of the fact that no undercut excavation had been encountered, Lowder's progress quickly fell somewhat behind schedule. Progress memoranda were prepared at regular monthly intervals by the Commission and sent with a monthly estimate to Lowder so that progress on the project could be gauged. On the date of the first report, 15 May 1965, four percent of the project was to have been completed. Lowder had completed 0.244 percent. On 15 July 1965 11.5 percent was to have been completed; Lowder had finished 6.9 percent. The problems encountered by Lowder during this time are not apparent from the record. However, a letter from the Commission to Lowder on 27 August 1965 indicates that a Lowder request for an extension of time for priming and paving temporary detours on the project was denied.

By late summer of 1965 Lowder had begun to remove undercut excavation. Although the 15 August 1965 report showed that Lowder had completed 11.491 percent of 18 percent on schedule, progress was, according to the Commission, "highly satisfactory and the quality of the work being performed is above average. . . . " About this time Marion Moore, resident engineer assigned by the Commission to the project, began to believe that there would be an overrun in the amount of undercut excavation:

"Now, until the project was opened up it was nothing more than an opinion but by late summer 1965, it was apparent that my opinion was correct. The basis of my opinion was my experience in Nash County over the twenty year

period. I am referring to the types of soil and the types of situations we invariably ran into on a project of that magnitude.

"I did not call this to anyone's attention prior to the letting because I had no knowledge of the figures until I received a copy of the proposal which was on—probably was in the same week that the project was let to contract. After I saw the figure, I may have expressed an opinion that I thought that 12,000 cubic yards was too low. I had the opinion that it was going to run more than 12,000 cubic yards. I don't recall making any specific statement to anyone. I don't recall making the statement to any particular person. By the end of the summer, we had already run more than 12,000 cubic yards. I think the 12,000 cubic yards had been exceeded by late summer, as I remember."

From August 1965 until January 1966 Lowder remained from five to eight percentage points behind schedule. However, the 15 January 1966 memorandum indicated that Lowder was almost on schedule: 47 percent was to have been completed, and Lowder had finished 46 percent.

In the winter of 1966 progress began to lag considerably. By 15 February, 46.5 percent of the project was complete, but 52.5 percent should have been done. Lowder's president testified the lag was attributable to "more undercut and also, it was winter weather then." On 15 March, 48 percent had been completed; however, the schedule called for 67 percent to be complete. Huneycutt testified:

"We still had the same equipment and personnel on the job to attempt to do the work that was required by the contract during the period. There was no more progress than this because we were encountering more and more of undercut, which was very difficult to move. As to the differential between the 48 percent and the 67 percent during that period, the weather had something to do with it."

Plaintiff Lowder's exhibit 10 indicates that by 15 January 1966 Lowder had removed 89,500 cubic yards of undercut; by 15 February, 108,000 cubic yards; by 15 March, no additional undercut had been removed; by 15 April, 114,000 cubic yards had been excavated.

On 1 April 1966 Lowder received a letter from R. W. Dawson, the Commission's assistant division engineer, noting that

progress was lagging considerably. The letter contained the following two paragraphs:

"I have made two inspections of this project along with the Resident Engineer, M. W. Moore, during this week and it was our opinion that with the present forces and equipment you now have on this project there is a serious doubt that you will complete this project by the contract completion date of October 1, 1966. It was also noted on each of these inspections that one or more pieces of your equipment was broken down and inoperative. After reviewing the overall progress on this project and in order to complete the project on time, you should make every effort to place additional men and equipment on the project in order to avoid any liquidating damages which according to the contract would be $200.00 for each calendar day after October 1, 1966.

"If you so desire, I will be glad to arrange a meeting on the project with officials of your company in order that a satisfactory conclusion can be reached regarding this matter. I would appreciate your giving this serious consideration as it is doubtful that the project will be completed on schedule with the forces and equipment now assigned to this project."

After receiving this letter, Lowder "tried . . . to put more equipment and personnel on the project."

Lowder's progress improved somewhat during the spring of 1966, and by 15 May it had completed 64 percent of the project when 79 percent was scheduled to be complete. During May Mrs. Nell Poplin, secretary-treasurer of Lowder, wrote to the Commission, apparently seeking an adjustment in the unit price for undercut excavation. Lowder had removed 134,000 cubic yards of undercut excavation by that time. Huneycutt stated that "we were getting farther and farther behind money-wise and progress-wise. We were real concerned and we felt like we had to do something."

Poplin's letter was answered by Dawson for the Commission. He pointed out that undercut excavation was a minor contract item, not a major item as Lowder had erroneously concluded, and was governed by Article 4.3B of the specifications. This article provides that either an increase or a decrease in the

contract unit price may be authorized. However, Dawson emphasized that it was the Commission's opinion "that the unit price bid of 50¢ per cubic yard is a fair price for the undercut excavation on this project." The letter contained the following response to Lowder's request for an extension of time (made in Poplin's letter) and to the progress on the project:

"With reference to your request for an extension of time, even though some items in the contract may overrun, this does not relieve the contractor of the responsibility for placing sufficient men and equipment on the project in order that it can be completed in accordance with the contract completion date. If the total amount of the contract is overrun there will be an automatic extension of time based on the percentage of the overrun of the contract estimate. Under date of April 1, 1966 your company was advised that we had serious doubts that you would complete this project on time and suggested that additional men and equipment be placed on the project. Since writing this letter, this has been discussed with your project superintendent several times. It is still noted on various inspections made on the project that there is a considerable amount of your equipment that is broken down, which is causing a slow down in the overall operations on the project."

By 15 June 1966 Lowder had finished 69.4 percent of the project. The schedule called for 87 percent to be complete. Lowder received the following letter from the Commission:

"In my letter to you of June 6, 1966, I called to your attention the fact that the progress on this project was not satisfactory. It is noted on your last estimate, No. 14 for period ending June 15, 1966, that you are 18% behind schedule. Estimate No. 14 was passed for payment, however, if progress does not improve by the time the next monthly estimate is due, it may be necessary that payment be withheld in accordance with Section 8 of the Standard Specifications.

"The unsatisfactory progress on this project has been called to your attention several times and has been discussed with your project superintendent again this week. It is, therefore, necessary that some action be taken regarding this matter. We are requesting that a meeting be held with officials of your company to resolve this matter.

If it meets with your satisfaction, we will plan to meet with you at the Highway Division Office, 926 East Ward Boulevard, Wilson, North Carolina, on June 30, 1966 at 10:00 a.m."

At the 30 June 1966 conference Lowder "was advised that there was approximately 95,000 cubic yards of borrow excavation and 4,000 cubic yards of undercut excavation still to be moved on this project and that no work had been done on underdrains, catch basins, proof rolling, and erosion control. It was also pointed out that none of the CABC [coarse aggregate base course] paving had been performed on the five Y Lines; even though there were three of these Y Lines on which the contractor could be working." Lowder's progress was also discussed:

"The possibility of placing additional men and equipment on this project was discussed, and the contractor advised they had a project in Mecklenburg County, which they expected to finish in time to move additional men and equipment to this project by July 15, 1966. This will step up the progress on the project, however, since according to the last monthly estimate, No. 14, through June 15, 1966, the contractor was 18% behind his progress schedule it was agreed that he would be allowed to submit a new progress schedule; taking into consideration the additional men and equipment he proposes to place on this project.

"It was pointed out to the contractor that the placing of additional motor graders and bulldozers on this project, to dress up the sections where the grading is complete will enable the subcontractors for soil erosion control and fencing to begin their work, and as the remaining items, and outlined in this letter, are usually time consuming it would be to their advanage to prepare the roadway in order the subcontractors could begin immediately."

By the date of the meeting Lowder had removed 154,000 cubic yards of undercut excavation, a 1,283 percent overrun of the original estimate. Lowder requested an extension of time. Extensions are governed by section 8 of the contract specifications, which provides for extensions only when the final estimate exceeds the contract estimate by five percent. Lowder felt that "they should be given an extension of time; even though the final estimate did not exceed the contract estimate by more than 5% as the undercut excavation definitely had slowed prog-

ress on this project." Lowder furthermore "requested an adjustment in unit price as per Article 4.3B of the Standard Specifications." The Commission advised that an adjustment under 4.3B was possible "provided he [Lowder] would supply supporting data showing that his costs exceeded the original contract price of 50¢ per cubic yard, however, that only an adjustment in price could be considered on the undercut excavation in excess of the 200% overrun as called for in Article 4.3B." Lowder's president testified that "I'm not sure that we informed them that we would be keeping up with the expense from now on on a force account basis, but we did actually keep up with it. As I recall, that is the way we left it."

Both parties agreed that "completion of this project by the contract completion date of October 1, 1966, *could be accomplished* provided the additional men and equipment were placed on the project." (Emphasis added.)

Work continued on the project at a slow rate. By 15 July 1966 Lowder had completed 70.5 percent of project 8.11618; 91 percent should have been finished. Because of the lag in progress, a revised schedule was drawn up. The 15 August 1966 estimate indicated that, under the revised schedule, Lowder's progress was more satisfactory: 73.46 percent had been finished; 75 percent should have been completed.

Soon, however, Lowder's progress began to lag, even under the revised schedule. Huneycutt wrote Moore, the resident engineer, "that we [should] be granted an extension of completion time on the above project due to the overrun of quantities." As of 15 September 1966 an overrun of 19.77 percent of the entire contract estimate was apparent. This was sufficient to allow an extension of time, pursuant to the "Specifications of Contract Time," of 14.77 percent of 516 calendar days (original length of time scheduled for completion), or 76 calendar days. The Commission acknowledged this and noted that although the overrun of 19.77 percent could not be guaranteed then, it appeared that "there should be ample overrun to grant an automatic extension of time until the first of December 1966 or later."

Lowder had completed 85 percent of the project when the original completion date expired. It received the following letter from the Commission concerning progress delay and an extension of time:

> "During the past two weeks, along with C. D. Bass, Area Construction Engineer and M. W. Moore, Resident

Engineer, I have made several inspections on the above project. Each time the progress on this project was progressing very slowly, and it was also noted that some of your equipment was broken down on each occasion. After each inspection a determination was made regarding the amount of progress, and from our inspections it is our opinion that you should make a more determined effort to expedite the completion of this project.

. . . .

"In view of the progress you are now making, your Company should make every effort to place additional men and equipment on this project in order that it can be completed as early as possible."

Lowder's president testified that this letter was the first time he learned that there were insufficient men and equipment on the job: "We felt, prior to the receipt of that letter, that we had sufficient personnel on the job to do what was necessary to do." We note that Lowder had been notified on at least two prior occasions, by letter of 1 April 1966 and by letter of 1 July 1966, that additional men and machinery would be necessary if the project were to be completed on schedule.

The bulk of the earth-moving operations had been completed by December 1966. Undercut excavation had been finished during October 1966, and Lowder was involved in fine-grading the project. Fine-grading is the finishing of a roadway by the movement of one or two inches of fill (material, usually earth or gravel, used to equalize or raise topography to a certain elevation). Lowder complained that it could not fine-grade the project during the winter months because the fill would freeze at night and thaw in the day, turning to mud. It was difficult to finish the fine-grading unless the fill was dry. Lowder thus sought the Commission's permission to close down the job until the weather changed. This request was denied by the Commission on 3 January 1967:

"In this connection your request for a close down order would be the same as an extension of the contract time and under Article 8.6 of the Supplemental Specifications on Pages 19, 20 and 21, an extension of time can only be allowed for delays due to an act of God or to an act of the Commission. Since normal weather conditions are not considered an act of God and the Commission has not taken

any action to delay this project, your request for a close down order and suspension of calendar days cannot be granted."

The Commission was also concerned that the project was not complete and complained that Lowder's performance was not satisfactory:

"I would like to point out to you that we have been concerned regarding the progress of this project for a considerable length of time and have written you regarding this matter under dates of April 1, 1966, June 6, 1966, June 24, 1966, July 1, 1966 and December 1, 1966. In my letter to you dated June 24, 1966, a meeting with representatives of your Company was set up for June 30, 1966 and a report regarding this meeting was made to Mr. John H. Davis, State Construction Engineer, under date of July 1, 1966, copy of which was sent to your Company. In the last paragraph of this report the following appears: 'It was agreed by all present that completion of this project by the contract completion date of October 1, 1966, could be accomplished provided the additional men and equipment were placed on the project.' Some additional equipment was placed on the project after this meeting, however, it was mostly for the heavy grading and was not the type of equipment conducive to the fine grading operations, which of course, would be started as soon as the rough grading had been completed.

"From our project records fine grading was started November 1, 1966 and at this time all Y Lines had been completed and opened to traffic with the exception of placing the guard rail. From November 1, 1966 to November 14, 1966 fine grading was completed from Station 480 to Station 653 (end of project). Since November 14, 1966, when a new Superintendent arrived on the project, the work has progressed very slowly due to the lack of the proper equipment, and it has been noted on several occasions that where the motor graders are fine grading that no self-loading equipment was available for shifting the small amount of earth-work and this was being done with a pusher and a self-propelled scraper, and as you know, this type of material is hard to load when windrows are involved. It is also noted that since November 14, 1966, there has been no Saturday, Sunday or Holiday work, al-

though until December 13, 1966, weather conditions did not prevent weekend operations. The Superintendent and two Foremen have left the project at 4:00 P.M. each Friday; leaving the motor grader operators to blade without anyone checking to determine if they were actually cutting the grade to the proper elevation.

"In an effort to expedite progress on the project, our personnel, on two occasions, checked the fine grading for the operators and during these two occasions 3,000 linear feet of one lane was fine graded, however, no scraper was available to pick up the windrows. This was done in an effort to acquaint your personnel with the best method for checking grade along with the operators, however, this has not been followed and very little has been accomplished since your supervision on this project are apparently unfamiliar with fine grading and the final clean up and dressing that is necessary to complete a project."

The Commission did acknowledge, however, that Lowder would be unable to continue working until the subgrade (the top surface of a roadbed that is prepared as a foundation for the pavement structure) dried out. It recommended that as soon as the grade was dry enough, "you should put qualified supervision on the project and complete it as early as possible."

Huneycutt, Lowder's president, stated: "We were working people and machinery every available day that we could, between the period October 1, 1966 and March 28, 1967, with the exception of holidays. During this period, equipment was there on the job, that could not be operated because of bad weather. We also had sufficient people there. The weather just wouldn't let us move any faster."

In the late summer of 1966, Marion Moore, resident engineer on the project, began to feel that the project would not be completed on schedule despite the fact that earth-moving operations had been finished. Lowder had only to "dress the job up and finish it." Moore stated that "progress . . . lagged seriously during late summer of '66. . . . There were not enough men and equipment of the type that were needed to do this type of work. Finishing equipment was needed at that time, rather than earth-moving equipment." It was Moore's opinion that five or six graders, minor equipment to pick up excess dirt, and "an awful lot of hand labor" were needed for a project of this size.

"[T]here was a general slowdown or lack of efficiency or change in attitude towards getting this minor work done. . . . I felt that additional motor graders and support personnel for final dressing operations were what was needed rather than large earth-moving pieces of equipment. I discussed that with the superintendent, Grady Meisenheimer. I believe he agreed."

In his daily reports over this period of time, Meisenheimer made references to the lack of equipment and qualified operators with which to finish the project. Equipment on the job was frequently plagued by breakdowns. The following entry on Meisenheimer's 9 September 1966 daily report was introduced into evidence:

"Ditch for underdrain caved in bed, took a lot of extra sand for a couple of hundred feet. If we don't get another good grader operator to go with the one good one we have, we will be here forever. Never been as out with a bunch in my life. Makes you sick to watch a couple of the operators and then go up on Barnhill's job and see the work that Crawford and Barnes do. Mr. Moore is expecting our slopes and ditches and shoulder points to look as good as theirs. I was up there this A.M.; D-7 is still down, got to fix front end on motor grade 7-E tomorrow."

On 15 January 1967 Lowder had completed 94.6 percent of project 8.11618. The Commission had let a paving contract to Rea Construction Company and was concerned that Lowder's failure to complete the project would result in delay to Rea. A conference was scheduled to discuss completion of the project. The project was divided into three "sections," and the Commission agreed to accept each section as it was completed. The entire project finally was accepted on 28 March 1967. Liquidated damages were imposed for an overrun of 50 calendar days at the rate of $200.00 per day. Pertinent facts concerning construction and overrun of the project, as embodied in the Commission's final estimate, are set forth below:

| | |
|---|---|
| Total Amount of The Final Estimate | 1,349,724.67 |
| Original Contract Estimate | 1,040,418.21 |
| Overrun amount | 309,306.46 |
| Overrun percentage | 29.729% |
| Overrun in excess of 105% | 24.729% |
| Original Calendar Days | 516 |
| Extension in Calendar Days due to overrun | 128 |

| | |
|---|---|
| Contract Completion Date _____ | October 1, 1966 |
| Revised Completion Date _____ | February 6, 1967 |
| Project Completed _____ | March 28, 1967 |
| Contract Liquidated damages per | |
| calendar day _____ | $200.00 |
| Overrun in time _____ | 50 Cal. Days |
| Liquidating damages _____ | $10,000.00 |

Additional facts necessary for the resolution of this appeal are set forth in the opinion.

*Berry, Bledsoe and Hogewood, by Louis Bledsoe and Yates W. Faison III, for Ray D. Lowder, Inc., plaintiff.*

*Attorney General Edmisten, by Assistant Attorney General Walter E. Ricks III, for the North Carolina State Highway Commission (now Department of Transportation), defendant.*

BROCK, Chief Judge.

This appeal raises two important issues for our determination: (1) whether the overrun constitutes a changed condition entitling Lowder to an equitable adjustment in the contract unit price for undercut excavation pursuant to § 4.3A of the specifications; and (2) whether certain entries and reports which were offered to substantiate Lowder's claim for additional compensation were properly admitted as substantive evidence.

Before reaching the questions raised by this appeal, we acknowledge the well-established rule that the Commission is not subject to suit except in the manner provided by statute. *Nello L. Teer Co. v. North Carolina State Highway Commission,* 265 N.C. 1, 143 S.E. 2d 247 (1965). General Statute 136-29 establishes the procedure for the settlement of claims against the Commission by a contractor who claims he has not received "such settlement as he claims to be entitled to under his contract." The statute has been interpreted to mean that recovery is possible only within the terms and framework of the contract. *Nello L. Teer Co. v. North Carolina State Highway Commission,* 4 N.C. App. 126, 166 S.E. 2d 705 (1969).

I.

[1] A threshold question to be resolved is whether the contract provision that "no subsurface information is available" should work to place the loss occasioned by the unexpected amount of undercut squarely on Lowder. This provision is designed ap-

parently to insulate the Commission, the agency responsible for stating estimates in its contract plans and proposals, from liability should those estimates turn out to be erroneous.

There can be little doubt that the contract proposals and plans, as submitted to the bidders for project 8.11618, constituted material representations as to the location and quantity of undercut excavation. Lowder relied on the relative accuracy of the undercut locations and quantities and was reasonably justified in doing so. It had no reason to believe that project 8.11618 would produce an excessive amount of undercut excavation.

As has been noted in the statement of facts, the estimate of 12,000 cubic yards of undercut was based on the results of a 1963 geological test conducted by the Commission's geologists. The results of that test were routed to the Roadway Design Department for computation of the amount of undercut to be used in the proposals for project 8.11618. The estimate of 12,000 cubic yards of undercut was submitted to bidders. However, the 1963 test, the basis of that estimate, was not made available to the bidders. As we have noted, the author of the 1963 test report emphasized that it was based on the conditions prevailing during the weeks preceding 11 September 1963 when "the country side was unusually dry from the lack of summer rains."

The clause in the project special provisions stating "[t]here is no subsurface information available on this project except as may be shown in the plans" cannot limit the Commission's liability. Clauses of this type, stating in effect that the contracting agency does not guarantee the statements of fact in the plans and specifications and requiring the contractor to make his own independent investigation of the site and satisfy himself of the conditions, are not given their full literal effect. See Morrison-Knudsen Company v. United States, 397 F. 2d 826, 841 (1968); Fehlhaber Corp. v. United States, 151 F. Supp. 817, 825, 138 Ct. Cl. 571, 584 (1957), cert. denied, 355 U.S. 877, 78 S.Ct. 141, 2 L.Ed. 2d 108. The information in the plans constituted positive representations upon which Lowder was justified in relying. We are of the opinion, therefore, that (1) a contracting agency which furnishes inaccurate information as a basis for bids may be liable on a breach of warranty theory, and (2) instructions to bidders to make their own independent investigations of the conditions to be encountered cannot be given full literal reach. Hollerbach v. United States, 233 U.S. 165, 34 S.Ct. 553, 58 L.Ed.

898 (1913); *see* Anderson, *Changes, Changed Conditions and Extras in Government Contracting*, 42 Ill. L.Rev. 29, 44 (1947). It is simply unfair to bar recovery to contractors who are misled by inaccurate plans and submit bids lower than they might otherwise have submitted.

**[2]** Having decided that Lowder should not solely bear the loss for its misplaced reliance on the contract quantities, we are confronted with the first of the two critical issues raised by this appeal: Did the overrun constitute a changed condition entitling Lowder to an equitable adjustment of the contract price pursuant to § 4.3A of the specifications?

We acknowledge the established principles that (1) an interpretation which gives a reasonable meaning to all its provisions will be preferred to one which leaves a portion of the writing useless or superfluous, *see* 4 Williston on Contracts § 619 (3d ed. 1961); and that (2) contract provisions should not be construed as conflicting unless no other reasonable interpretation is possible. *Hol-Gar Mfg. Corp. v. United States*, 351 F. 2d 972, 979, 169 Ct. Cl. 384, 395-396 (1965). A standard provision such as § 4.3A cannot lightly be read out of the contract or deprived of most of its normal substance.

The Commission's argument is that § 4.3A, dealing with "Alterations of Plans or Character of Work," should be ignored in favor of § 4.3B, dealing with "Overruns and Underruns." The gist of this assertion is that § 4.3B is a more specific contract provision and should control the more general § 4.3A. The Commission cites one of Williston's secondary rules of contract interpretation, as reported in the Restatement, Contracts § 236(c), as the basis for this contention: "Where there is an inconsistency between general provisions and specific provisions, the specific provisions ordinarily qualify the meaning of the general provisions." This is not an ironclad rule to be followed in every case. It is merely one rule helpful in arriving at an interpretation of a contract.

Section 4.3A, governing "Alteration of Plans or Character of Work," states:

"The Commission reserves the right to make, at any time during the progress of the work, such increases or decreases in quantities and such alterations in the details of construction, including alterations in the grade or alinement of the road or structure or both, as may be found to

be necessary or desirable. Such increases or decreases in alterations shall not invalidate the contract nor release the Surety, and the Contractor agrees to accept the work as altered, the same as if it had been a part of the original contract.

"Under no circumstances shall alterations of plans or of the nature of the work involve work beyond the termini of the proposed construction except as may be necessary to satisfactorily complete the project.

"Unless such alerations and increases or decreases materially change the character of the work to be performed or the cost thereof, the altered work shall be paid for at the same unit prices as other parts of the work. If, however, the character of the work or the unit costs thereof are materially changed, an allowance shall be made on such basis as may have been agreed to in advance of the performance of the work, or in case no such agreement has been reached, then the altered work shall be paid for by force account in accordance with Article 9.4.

"No claim shall be made by the Contractor for any loss of anticipated profits because of any such alteration, or by reason of any variation between the approximate quantities and the quantities of work as done.

"Should the Contractor encounter or the Commission discover during the progress of the work conditions at the site differing materially from those indicated in the contract, which conditions could not have been discovered by reasonable examination of the site, the Engineer shall be promptly notified in writing of such conditions before they are disturbed. The Engineer will thereupon promptly investigate the conditions and if he finds they do so materially differ and cause a material increase or decrease in the cost of performance of the contract, an equitable adjustment will be made and a supplemental agreement entered into accordingly.

"In the event that the Commission and the Contractor are unable to reach an agreement concerning the alleged changed conditions, the Contractor will be required to keep an accurate and detailed cost record which will indicate not only the cost of the work done under the alleged changed conditions, but the cost of any remaining unaffected quan-

tity of any bid item which has had some of its quantities affected by the alleged changed conditions, and failure to keep such a record shall be a bar to any recovery by reason of such alleged changed conditions. Such cost records will be kept with the same particularity as force account records and the Commission shall be given the same opportunity to supervise and check the keeping of such records as is done in force account work."

The section which the Commission contends is solely applicable, § 4.3B, governing "Overruns and Underruns," states:

"Major contract items will be listed in the special provisions. All contract items that are not listed as major contract items will be considered to be minor contract items.

"If the actual quantity of any major contract item overruns or underruns the original bid quantity by more than 15 percent of such original bid quantity, an increase or decrease in the contract unit price may be authorized by the Engineer in accordance with these provisions. Revised contract unit prices pertaining to overruns of major contract items will be applicable only to that portion of the overrun which is in excess of 15 percent of the original bid quantity. Revised contract unit prices pertaining to underruns of major contract items will be applicable to the entire quantity of the affected contract item.

"If the actual quantity of any minor contract item overruns the original bid quantity by more than 200 percent of such original bid quantity, an increase or decrease in the contract unit price may be authorized by the Engineer in accordance with these provisions. Revised contract unit prices pertaining to overruns of minor contract items will be applicable only to that portion of the overrun which is in excess of 200 percent of the original bid quantity. Revisions will not be authorized under these provisions for any contract unit price pertaining to a minor contract item which underruns the original bid quantity.

"Whenever it is anticipated that the quantity of any major contract item may overrun or underrun the original bid quantity by more than 15 percent of such original bid quantity, or that the quantity of any minor contract item may overrun the original bid quantity by more than 200 percent of such original bid quantity, the Engineer may,

either at his own volition or at the written request of the Contractor, issue an authorized modification covering the overrun or underrun and payment therefor will be made as provided below:

"1. Where the Contractor and the Engineer are in agreement on the increase or decrease to be made in the contract unit price, then a supplemental agreement covering the revised contract unit price will be issued in conjunction with the authorized modification.

"2. Where the Contractor and the Engineer are not in agreement on the increase or decrease to be made in the contract unit price, then a force account notice will be issued in conjunction with the authorized modification."

A reasonable interpretation of both § 4.3A and § 4.3B is that the purpose of these provisions is to provide the means to resolve controversies arising when, during construction, (1) one or both parties find its necessary to alter the details of construction; (2) the character of work and the unit costs thereof change from those originally estimated (e.g., when rock is discovered during excavation, and plans indicated that only soil would be excavated); (3) unforeseen conditions are encountered which materially change the cost of performing the contract (e.g., this case); and (4) the contractor is required to do a greater or lesser amount of work, within prescribed percentage limits, than could be originally estimated. Whether § 4.3A or § 4.3B is *more* applicable to this case is not our concern. The main apparent purpose of either section is to provide an immediate remedy for controversy arising during construction.

Our interpretation of the contract is buttressed by the fact that § 4.3B contains no indication that it is to override § 4.3A or that it is intended to be the exclusive remedy for obtaining an adjustment in the contract price. There is no obligation to proceed under § 4.3B. That section dictates how a contractor *may* be compensated; it does not dictate how he *must* be compensated. Although § 4.3B is designed to smooth over problems arising when overruns or underruns occur, it does not, by virtue of that fact, indicate that recovery is not available under § 4.3A when the cost of doing unforeseen added work greatly differs from the stated unit price. To adopt the Commission's argument that § 4.3B is solely applicable to these facts would negate the plain language of that section and of § 4.3A.

Other jurisdictions have grappled with the problems raised on this appeal—specifically, whether a large overrun or underrun can constitute a changed condition necessitating an adjustment in contract price. Generally these jurisdictions have considered large overruns to be within the scope of "changed conditions" clauses. We note, furthermore, that § 4.3A is substantially similar to the language of both Article 4 and Clause 4 of the standard form United States government contract:

> "Should the contractor encounter, or the Government discover, during the progress of the work subsurface and/or latent conditions at the site materially differing from those shown on the drawings or indicated in the specifications, or unknown conditions of an unusual nature differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the plans and specifications, the attention of the contracting officer shall be called immediately to such conditions before they are disturbed. The contracting officer shall thereupon promptly investigate the conditions, and if he finds that they do so materially differ the contract shall, with the written approval of the head of the department or his duly authorized representative, be modified to provide for any increase or decrease of cost and/or difference in time resulting from such conditions."

(This is an earlier version of Clause 4.)

We therefore find it helpful to look to the federal as well as state cases wherein questions of changed conditions have been determined. We do this while keeping in mind that neither our Supreme Court nor this Court has been called upon previously to determine whether the changed conditions language of § 4.3A may be applied to an overrun or underrun situation.

The general rule in cases from other jurisdictions has been to designate significant overruns as being within the purview of changed conditions clauses. *See* Annot., 85 A.L.R. 2d 211 (1962). Thus, important variations "in estimated quantities given by the Government to prospective bidders has been held to constitute a changed condition. While an underrun of ten per cent has been considered insufficient, errors of more than ten per cent ranging upward to fifty per cent have been held to entitle a contractor to an adjustment of his contract price because of changed conditions." Gaskins, *Changed Conditions And*

*Misrepresentation Of Subsurface Materials As Related To Government Construction Contracts,* 24 Fordham L. Rev. 588, 591 (1956).

In *Hash v. R. J. Sundling & Son, Inc.,* 150 Mont. 388, 436 P. 2d 83 (1967), a subcontractor procured a contract with Sundling, prime contractor for the State of Montana, for excavation work required for the construction of a 5½ mile highway. Hash agreed to do 155,584 cubic yards of unclassified excavation work for 25¢ per cubic yard. Shortly after commencing work, excessive wetness below the subgrade was encountered. This required extensive "dig outs" below the subgrade to provide a solid foundation for construction of the highway bed. The cost of the "dig outs" proved to be 92¢ per cubic yard. Due to a grade change, the amount of excavation work was reduced to 135,000 cubic yards. Although Hash performed 149,000 cubic yards of work, his claim for additional compensation was not based on the overrun, but on a substantial increase in the total cost of excavation work because of the increased ratio of high-priced excavation to low-priced excavation. The court adhered to the principle that "the contractor who encounters substantially different conditions in performing a construction contract from those contemplated and set forth in the plans and specifications contained herein may be entitled to increased compensation for the additional work." 150 Mont. at 394, 436 P. 2d at 86. It noted that Hash justifiably had relied on the plans in making his bid. When the variation occurred, Hash was forced to perform an "entirely different contract than the one agreed upon," 150 Mont. at 395, 436 P. 2d at 86, and was entitled to the reasonable value of his additional services.

*Hash* is representative of many cases holding that changed conditions may be found from important variations in contract quantities. *(See* Annot., 85 A.L.R. 2d 211 [1962] ; Anderson, 42 Ill. L. Rev. 29 [1947] ; Gaskins, 24 Fordham L. Rev. 588 [1956] and cases therein cited.) The Commission urges us to find that § 4.3A is designed to cover only the kind of situation arising when unexpected material, such as rock, is encountered during excavation. In our opinion the encountering of unexpected excessive wetness may constitute as much a change of condition as the encountering of unexpected rock. Had Lowder's difficulties not arisen from a latent geological problem, but from a failure to inform itself of reasonably observable physical factors, we would be disposed to reach another conclusion.

Where parties labor under a mutual mistake as to vital facts, the contract, in the interests of fairness, should be flexible enough to permit an equitable adjustment.

The broad purpose of changed conditions clauses, and, indeed, the purpose of § 4.3A, is to encourage low, competent bids.

> "Cost hazards are such in subsurface areas that qualified contractors, prior to the adoption of the article used in standard forms of government contracts, were obliged to make extremely high bids based on the assumption that the worst conditions conceivable would be met in the performance of the work. Drafters of contract forms foresaw greater economy to the government if contractors could be encouraged to bid upon normal conditions, with the assurance that they would be reimbursed in case of abnormal conditions actually encountered and to the extent that they actually increase costs. The revision of the costs due to conditions that are abnormal is accomplished by what the Changes article denominates an 'equitable adjustment'." Anderson, *Changes, Changed Conditions and Extras in Government Contracting*, 42 Ill. L. Rev. 29, 47 (1947).

To ignore this policy is to open the door to disastrous consequences for the State.

Our construction of the terms of the contract and the lesson of precedents from other jurisdictions convince us that § 4.3A permits an equitable adjustment in contract unit prices for materially different, "changed" conditions. The Commission's first argument is overruled.

## II.

This brings us to the second critical issue raised by this appeal: Did Lowder's compilation of damages report qualify as a record made in the regular course of business so as to permit its admission into evidence as an exception to the hearsay rule?

The compilation of damages report, which the Commission argues was improperly admitted, is divided into three parts. Part A is a claim for additional compensation by reason of rental of extra equipment for undercut excavation in the amount of $94,310.14. Part B is a claim for additional compensation for labor in the amount of $24,343.67. Part C is a claim for additional compensation for expenses incurred between 1

October 1966, the original deadline, and 30 March 1967, two days after the project was accepted by the Commission. Labor costs in Part C are listed as $91,504.94; bond, insurance, and tax as $14,755.98; miscellaneous expenses as $36,540.70; and equipment rental as $219,796.30. The Part C total is $362,597.92. The aggregate total, less the $129,874.64 paid at the unit bid price by the Commission to Lowder for the overrun is $351,377.09.

The compilation of damages summary was taken from an analysis of daily reports prepared by Grady Meisenheimer, Lowder's superintendent during most of the construction of project 8.11618. Meisenheimer testified by deposition that he kept daily records of "laborers, machinery, and the type of work that we were doing on the job. We kept records of all of the equipment, how many hours it would run, the kind of work we were doing . . . whatever we were doing, we kept a record of it." These reports were filled out each day after work had stopped, and were mailed each night to the Lowder home office in Albemarle. After lying "fallow" for several years in Lowder's files, the reports were used to prepare the compilation of damages report. Mrs. Nell Poplin, secretary-treasurer of Lowder and "custodian of the financial records," stated that Lowder compiled its information from the daily reports and from an analysis of the reports which had been prepared by Meisenheimer. Poplin testified that "[w]e would take the equipment that was used on the undercut excavation, the men who were the operators of that equipment, and the number of hours each worked, equipment and men." "We took off the equipment, the materials that he received, the number of people on the payroll, the total of skilled, total of unskilled; all the information that he had; . . . " Part A of the compilation of damages "came from the daily reports made by Grady Meisenheimer." Part C was "taken directly from our job cost records." Part B "came directly from our payroll accounts." The cost records, which rely on the daily reports also, were compiled by Mrs. Poplin.

We have carefully examined the daily reports prepared by Lowder's superintendents during construction of project 8.11618. Each report is made on a looseleaf, printed form. On the front side of the form there are spaces for reporting weather conditions, the work day, and the number of skilled and unskilled laborers present. The majority of space is allocated to three headings: "Road Way," "Pipe Lines," and "Clearing." Some

space is reserved for "Remarks." On the back side of the form there are two spaces: one is reserved for the listing of "Material Received, Borrowed Or Rented"; the other is reserved for "List of Equipment Nos."

During Grady Meisenheimer's tenure as superintendent, the reports were filled out in some detail. Ample remarks are set out, progress of work is recorded, and equipment on the job site is listed. However, there is, in the majority of the reports, no indication of equipment actually in operation or broken down except as may be reported in the "Remarks." The hours of operation are not set out, and there is no way to tell what equipment was in operation. When equipment appears as "broken down" in the "Remarks," it also appears in the list of equipment on the job site on the reverse side of the form. Although we regard these reports as incomplete, the reports filed after Meisenheimer's departure are practically devoid of information. Little is reported about the nature of work done, and no equipment is listed as being on the job site.

In 1970 the daily reports were reviewed for the first time by Meisenheimer. He stated that he had not been informed, at the time of his review, that Lowder had filed a claim with the Commission for additional compensation. However, Meisenheimer was asked by Lowder officials to return for some reason to help compile the cost records. (Meisenheimer had left the employ of Lowder in November, 1966.) For about two to three weeks, Meisenheimer "glanced through" the daily reports. He had no assistance in this task: "I just gave him the hours and the manpower hours that were involved and the operators. I did not indicate how many hours each individual person spent doing undercut excavation. I stated each piece of equipment, because each piece of equipment has got a man on it, and if that piece of equipment runs ten hours, then that man is bound to be on it ten hours."

Clyde Huneycutt, Lowder's president, maintained that "it would be very hard to look at the daily reports and tell who was doing what other than Mr. Grady Meisenheimer." Huneycutt testified:

"As to the record of equipment contained in the diaries I am not sure of whether they indicate what equipment was working. . . . I could pretty close tell by looking at the daily report, what equipment was not working and what

equipment was. Mr. Meisenheimer would know it much better than I would. From looking at the daily report dated October 12, 1966 . . . it would have to be draglines or scrapers performing the undercutting. It could be either one. I cannot tell by looking at the diary. It looks now like some undercutting was done but I cannot tell whether it was done that day or not. The date on the report is not necessarily the date that it was done. . . . On this day, October 12th, 1966, he says that total labor, 36—skilled 19, unskilled 17. As to what they were doing, you can only tell as to what he says. He says they are fine grading. . . . I can't tell how many are fine grading. I cannot look at any other entry in the diary and tell what individual persons were doing on the project.

"I cannot tell, by looking at any of the other daily reports, what individual persons are doing, nor can I tell by looking at the number that are working and the work that was done, except if he tells on that particular day."

Similar testimony was elicited from Mrs. Poplin, custodian of the financial records and the official in charge of preparation of the claim for additional compensation:

"From the daily reports, I could tell what equipment was on the job. I could not tell what type of work that equipment was being used for. I could tell how many persons were on the job by looking at the daily reports. I could not tell what those persons were doing. . . . I could not tell what equipment was in operation."

Because the overrun in the amount of undercut excavation altered Lowder's costs on project 8.11618, it was important that accurate cost records be kept. Poplin elaborated on the method of compilation:

"It was not my job to take the equipment off [the daily reports] and say what that piece of equipment was doing. In order to compile records as to costs incurred in the undercut excavation, it was necessary however, that that be done. That equipment was taken off by someone else. . . . I do not know how they did it. . . . I'm not sure how the equipment that was used in undercut was compiled—The equipment was taken from the daily reports that was compiled at the end of the month and given to me. I do not know when it was taken from the daily reports . . . . [However],

Lowder, Inc. v. Highway Comm.

> I transferred these figures to the job cost cards. That is
> the total job cost as I testified to. . . .

> "Mr. Meisenheimer helped compile records for the under-
> cut excavation. *I'm not sure when he did this, but it was
> before our claim was filed with the . . . Commission.* [He]
> indicated what equipment was used on the undercut on a
> daily basis. He did not compile the undercut record of equip-
> ment every day. He compiled it when he came and helped get
> the information together for the equipment and the labor.
> *This was before we filed our claim. It could have been in
> preparation of the claim.*" (Emphasis added.)

Mrs. Poplin stated that Meisenheimer knew exactly "what went
on," even though he was reviewing daily reports which he had
not seen in four years and which were not clear to officers of
Lowder. During Meisenheimer's employment with Lowder on
project 8.11618, he had many conversations with Mrs. Poplin
concerning the cost of undercut. Mrs. Poplin did not keep rec-
ords of these conversations. She also did not keep records of
certain labor and equipment costs as they related to undercut:
"I'm not sure how they compiled [the records]. During our
course of conversations, Mr. Meisenheimer told me what men
and equipment were being used in removing undercut excava-
tion, but I did not keep records of [this]. We talked about it
quite often."

The reason for Lowder's asking Meisenheimer to return to
help compile records is disclosed by Poplin's following state-
ments:

> "I could not tell prior to the time when Mr. Meisen-
> heimer came back exactly what men and equipment had
> been used in removing undercut excavation. Mr. Meisen-
> heimer was the best person to tell that. He was called back
> in for the purpose specifically of pointing out which ones.
> I don't know how he went about pointing out what equip-
> ment and which men were used for removal of the undercut
> excavation. I don't know how he did it, but he did."

Although Mrs. Poplin computed the total job cost, she stated,
"I do not now know the cost Ray Lowder incurred, in removing
one cubic yard of undercut excavation."

Meisenheimer maintained that he did not know why he was
asked to furnish Lowder with information compiled from the

daily reports. He received no compensation for his work. But Meisenheimer did testify that when he first learned of Lowder's lawsuit (it is not clear whether he learned of this before he was asked to return to Lowder), he stated that "they deserved every penny they're asking for and more too because it was worth every bit of what they're asking for and I don't know what that is."

[3] In this jurisdiction business entries have long been recognized as an exception to the hearsay rule provided (1) the entries are made in the regular course of business; (2) the entries are made contemporaneously with the events recorded; (3) the entries are original entries; and (4) the entries are based upon the personal knowledge of the person making them. *See generally Thompson Apex Co. v. Tire Service*, 4 N.C. App. 402, 166 S.E. 2d 864 (1969); 1 Stansbury, N. C. Evidence § 155 (Brandis rev. 1973). Systematic checking by businesses, their regular and continuous recordation, and the experience of businesses in relying on their entries are reasons why entries have traditionally been recognized as being unusually reliable. *See* Laughlin, *Business Entries And The Like*, 46 Iowa L. Rev. 276 (1961).

[4] In our opinion the compilation of damages report was improperly admitted as an exception to the hearsay rule. It cannot meet the requirements of regularly kept business entries because it was made neither in the regular course of business nor contemporaneously with the events recorded. The result is that the report is not so reliable and trustworthy as to reflect accurately the actual costs incurred as a result of the overrun. The sources of information from which the summary was drawn, its method of compilation, and the circumstances surrounding the entire matter indicate a lack of trustworthiness.

The first requirement for the admissibility of business entries, that the entries be made in the regular course of business, is designed to insure a high degree of accuracy "because such books and records are customarily checked as to correctness by systematic balance-striking, [and] because the very regularity and continuity of the records is calculated to train the record-keeper in habits of precision. . . . " McCormick on Evidence § 306 (2d ed. 1972). This requirement is clearly not met by a summary of incomplete daily reports prepared for use in litigation rather than for the routine operation of the business. The evidence indicates that both Meisenheimer (by deposition) and Lowder officials repeatedly sought to convince the court that

the report had not been prepared for litigation. Hence they continually asserted that the summary was completed *before* Lowder's claim was filed. This is immaterial. We find it difficult to believe that Meisenheimer, who was no longer in Lowder's employ, never knew why he was asked to compile his report. On cross-examination Mrs. Poplin admitted that Meisenheimer's information "could have been in preparation of the claim," and not for the routine operation of the business.

We are also of the opinion that the report fails to meet the second requirement for admissibility as well. It was not made contemporaneously with events recorded on the incomplete daily reports. Thus we are asked in this case to find reliable a report which could only have been based, in large part, on one person's personal judgment, discretion, and memory after a lapse of four years. Lowder officials themselves could not glean enough information from the daily reports (the information on the reports is not some kind of specialized information that the officers were untrained to read) to prepare a summarized compilation of damages. Had the daily reports not been incomplete, we might not express reservations about the finalized report. We are not disposed, however, to rely on a report grounded in an undetached judgment and a fading memory. It simply does not rise to the level of reliability commonly accorded business entries.

It is not our intention to require copious entries in business records. But we are of the opinion that entries should be so complete and in such detail as to indicate that they are reliable and accurate. To report that 36 machines are on a job site on a given day is unsatisfactory. It would be better practice to report not only the number of machines on the job but also the number of machines operating, the task each performs, and the length of time each operates. The product of that kind of record-keeping is more likely to bear the earmarks of reliability.

In the area of evidence dealing with the admissibility of reports or summaries of complicated entries, problems of the motivation of informants have been both difficult and the source of disagreement among courts. Where motivation suggests that trustworthiness is not likely to result, and where reports or summaries have been prepared for use in litigation rather than for the systematic operation of a business, courts have found them to be inadmissible as not having been made "in the regular course of business." In *Palmer v. Hoffman,* 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645 (1943), the Court upheld a district

court's ruling that an accident report, made by the since deceased engineer and offered by defendant railroad trustees, was inadmissible on those grounds. The Court stated that the accident report was not "typical of entries made systematically or as a matter of routine to record events or occurrences, to reflect transactions with others, or to provide internal controls. . . . Unlike payrolls, accounts receivable, accounts payable, bills of lading and the like, these reports are calculated for use essentially in the court, not in the business. Their primary utility is in litigating, not in railroading." 318 U.S. at 113-14.

It is apparent that *Palmer* is factually distinguishable. It is also clear that there can be no objection that regularly-kept business entries are self-serving. *See* Laughlin, *Business Entries And The Like,* 46 Iowa L. Rev. 276, 289 (1961). Nevertheless, we refuse to find reports admissible when they lack minimum requirements of trustworthiness and reliability. The compilation of damages report was prepared for this litigation; it was based on incomplete daily reports; it was not contemporaneous but was the product of Meisenheimer's personal judgment, discretion, and memory some four years later. It simply is not the product of an efficient clerical system, and it has not been made in the regular course of business. In *Palmer,* the Court said that the test of admissibility is to be determined by "the character of the records and their earmarks of reliability * * * acquired from their source and origin and the nature of their compilation." 318 U.S. at 114. Because the report fails to meet the requirements that it be made in the regular course of business and that it be made contemporaneously, the report cannot qualify as an exception to the hearsay rule. We hold it inadmissible as evidence of the truth of its contents. *See Hartzog v. United States,* 217 F. 2d 706 (4th Cir. 1954).

We point out, in conclusion, that a part of § 4.3A, the section permitting an equitable adjustment due to materially changed conditions, provides:

> "In the event that the Commission and the Contractor are unable to reach an agreement concerning the alleged changed conditions, the Contractor will be required to keep an accurate and detailed cost record which will indicate not only the cost of the work done under the alleged changed conditions, but the cost of any remaining unaffected quantity of any bid item which has had some of its quantities affected by the alleged changed conditions, and failure to

keep such a record shall be a bar to any recovery by reason of such alleged changed conditions. Such cost records will be kept with the same particularity as force account records and the Commission shall be given the same opportunity to supervise and check the keeping of such records as is done in force account work."

This is not only a reasonable provision of the contract but also one which the parties clearly agreed upon. The disposition in this case does not require a discussion of this part of § 4.3A, as we have found it necessary only to reach the question of admissibility of the compilation of damages report as a business record.

In our opinion Lowder's claim for an equitable adjustment for additional costs incurred by reason of the large overrun encountered in the undercut operations, occasioned by unexpected and excessive wetness, is cognizable under § 4.3A, Alteration of Plans or Character of Work, of the contract. However, because of the errors discussed above, in admission of evidence of additional costs, the judgment of the trial court is reversed, and the cause is remanded for a

New trial.

Judges PARKER and ARNOLD concur.