**RUBY–COLLINS, INC., Plaintiff,**

v.

**CITY OF CHARLOTTE, Defendant.**

**No. C–C–89–287–P.**

United States District Court,
W.D. North Carolina,
Charlotte Division.

July 3, 1990.

Lynn C. Stewart, David H. Flint, Schreeder Wheeler & Flint, Atlanta, Ga., Richard E. Fay, Petree Stockton & Robinson, Charlotte, N.C., for plaintiff.

H. Michael Boyd, Charlotte, N.C., for defendant.

## MEMORANDUM OF DECISION AND ORDER

ROBERT D. POTTER, Chief Judge.

THIS MATTER is before the Court on the Defendant's Motion for Summary Judgment, filed February 12, 1990. The Plaintiff has filed its Response to the Defendant's Motion.

On May 15, 1990, the Court conducted a hearing in Charlotte, North Carolina to listen to the parties' oral arguments on the Plaintiff's Motion for Summary Judgment. At the hearing, the Plaintiff, Ruby–Collins, Inc. (hereafter "Ruby–Collins"), was represented by Attorney Richard E. Fay of the law firm of Petree, Stockton and Robinson of Charlotte, North Carolina and Attorney Lynn C. Stewart of the law firm of Schreeder, Wheeler & Flint of Atlanta, Georgia. The Defendant, the City of Charlotte (hereafter "the City"), was represented by Attorney H. Michael Boyd of the City Attorney's Office. Since the hearing on May 15, 1990, the parties have filed additional materials with the Court.

In this diversity action, Ruby–Collins is seeking to recover approximately $1.5 million as an equitable adjustment to a contract for the construction of a water main through the City of Charlotte. In constructing the water main, Ruby–Collins needed to excavate a trench for the pipeline, lay the pipeline, and fill in the trench. According to the specifications in the contract between Ruby–Collins and the City, Ruby–Collins needed to fill in the trench by encapsulating the pipeline in a minimum of

one foot of stone and by depositing six to eight feet of backfill in the trench on top of the stone. Backfill is the term given to materials used to fill in the trench and often is the soil originally excavated in digging the trench. In backfilling the trench, Ruby–Collins encountered some moisture problems and, consequently, allegedly provided materials and equipment and performed work that was beyond the scope of the contract and could not reasonably have been anticipated. Ruby–Collins bases its claim for an equitable adjustment to the contract between itself and the City on this alleged extra work.

## I. THE PARTIES' CONTENTIONS IN REFERENCE TO THE CITY'S MOTION FOR SUMMARY JUDGMENT

The City bases its Motion for Summary Judgment on three grounds. The City argues, first, that the contract between Ruby–Collins and itself clearly required Ruby–Collins to perform all of the backfill work, including providing any materials needed to complete such work, necessary for the installation of the water main in conformity with the project's specifications. The City argues, second, that if the work performed by Ruby–Collins was not work originally covered by the contract, but extra work, Ruby–Collins failed to comply with the contract's applicable provisions regarding the recovery of additional compensation for extra work. The City contends that Ruby–Collins failed to give timely notice of the filing of a claim for extra work, failed to file a timely claim for each of the instances claimed to be extra work, and failed to maintain proper cost records. The City argues, third, that Ruby–Collins' pre-bid subsurface investigation, its primary basis for recovery, admittedly failed to contain a determination that Ruby–Collins could use the excavated soil immediately for backfill, despite Ruby–Collins' initial allegations in the Complaint to the contrary.

Ruby–Collins foreseeably argues that the Court should deny the City's Motion for Summary Judgment. Ruby–Collins argues, first, that by encountering conditions which substantially changed the nature of the work performed and which were not contemplated by either Ruby–Collins or the City, it is entitled to an equitable adjustment to the contract. Ruby–Collins contends that the absence of a changed conditions clause in the contract does not preclude an equitable adjustment to the contract. Ruby–Collins contends, also, that the extra work provisions of the contract authorize an equitable adjustment. Ruby–Collins argues, second, that it fulfilled the contract's applicable notice, time-keeping, and record-keeping requirements or, alternatively, that the City waived those requirements. Ruby–Collins argues, third, that its own pre-bid site investigation was adequate and that in preparing its bid, it had a right to rely upon the City's soil reports.

## II. STATEMENT OF THE FACTS

### A. The Water Main Project and Its Construction

In June 1986, the City solicited bids for the construction of a water main. The proposed water main would begin at the intersection of Tuckaseegee Road and Vanizer Street in northwestern Charlotte and end at the intersection of Sharon Amity and Providence Roads in southeastern Charlotte, a distance of approximately six miles. The City divided the water main project into three distinct segments. The City eventually awarded the entire water main project to Ruby–Collins, who submitted the lowest bid of $11.5 million. Ruby–Collins has constructed the water main and has received in excess of $12.5 million from the City for work performed.

The City retained HDR Infrastructure, Inc. of North Carolina (HDR) to serve as the engineer for the water main project. As the engineer, HDR designed the water main and administered the contract between Ruby–Collins and the City. HDR in turn retained Soil and Material Engineers, Inc. (SME) to, among other things, prepare a "Report of Subsurface Explorations" (hereafter "the SME Report"), in which SME evaluated the subsurface conditions along the route of the pipeline, including soil and ground-water conditions, and pro-

vided design and construction guidance concerning backfill placement and compaction requirements within roadway areas. The City provided the SME Report to potential bidders for use at their own risk.

The design of the water main project required Ruby–Collins to install the water main mostly under existing, paved streets. The design, therefore, required Ruby–Collins to dig a trench, install the pipeline, and backfill the trench. Under the design's specifications, the backfill needed to be free of rocks, cobbles, roots, sod or other organic matter, and frozen material and also needed to meet moisture density requirements established by HDR. HDR retained SME to, in addition to preparing the SME Report, determine whether Ruby–Collins completed the backfill process in accordance with the design's specifications.

In computing its bid for the water main project, Ruby–Collins reviewed the pipeline route, made sample borings during its own pre-bid site investigation, and studied the SME Report. According to the deposition testimony of Mr. Ben Morgan, Ruby–Collins's Vice President, Ruby–Collins during its pre-bid site investigation did not try to evaluate the condition of the soil to be excavated regarding its suitability for use as backfill. Ruby–Collins, instead, merely engaged in a visual inspection of the proposed pipeline route. Ruby–Collins assumed that the soil which it intended to excavate in digging the trench and to use as backfill would be sufficiently dry to compact immediately and allow Ruby–Collins to prepare for paving. Ruby–Collins based this assumption on the fact that the soil already was being used to support the paving of the existing streets. Ruby–Collins, however, made no specific effort to determine the accuracy of its assumptions.

In computing its bid, Ruby–Collins did not include costs for hauling, storing, drying, or replacing most of the common trench backfill. Ruby–Collins included in its anticipated costs, instead, the use of a conveyor belt that would allow the excavated soil from the trench to be loaded onto the conveyor belt, transported back along the pipeline route approximately one hundred yards, and deposited immediately into the trench to cover the newly laid pipe. The process using the conveyor belt is known as the "cut and cover" method.

Ruby–Collins thereafter submitted its bid, which the City subsequently accepted. On June 9, 1986, Ruby–Collins and the City executed a series of three Agreements, each covering a separate segment of the water main. Each Agreement, however, was identical, except for the language specifying the segment of the water main project covered by that specific contract and identifying characteristics unique to that particular segment of the water main project. Because of the virtual identity among the three Agreements, the Court will refer to them collectively as "the Contract."

After executing the Contract, Ruby–Collins began construction of the water main. During the course of its performance, Ruby–Collins discovered that approximately twenty percent of the soil under the paved streets had a moisture content that made the soil unsuitable for immediate use as backfill. According to the deposition testimony of Mr. Joseph C. Stowe, who is the Director of the Charlotte–Mecklenburg Utility Department (CMUD), a variety of things could have caused the moisture in the soil, including but not limited to rain after the removal of the pavement and before excavation or rain after excavation of the trench. Ruby–Collins regularly discussed with the City its continuing problems, of which everyone was aware. To meet the design's specifications regarding the requisite compaction for backfill material, however, Ruby–Collins needed either to dry the soil or to haul in other backfill. Ruby–Collins eventually abandoned its "cut and cover" method using a conveyor system and hauled other backfill material to the site. Because of its assumption that the soil under the streets was suitable for use as backfill and its conclusion that the soil under the streets was similar to, and had the same moisture content of, the soil tested and reported in the SME Report, Ruby–Collins believed that it had performed extra work not covered by the Contract.

Because of the moisture encountered during the construction of the water main, Ruby–Collins in October 1986 requested a change order encompassing the backfill problems. HDR reviewed Ruby–Collins' request for a change order and determined that the work was within the scope of the Contract. By a letter dated December 15, 1986, HDR did not recommend a change order. The CMUD also considered Ruby–Collins' request for a change order and reached a decision similar to the decision reached by HDR. The CMUD notified Ruby–Collins of its decision by a letter dated February 5, 1987.

In addition to seeking a change order, Ruby–Collins also sought additional compensation for extra work. In January 1987, Ruby–Collins requested additional compensation by way of a written letter to the City, as required by the Contract's provisions governing claims for extra work. The City denied Ruby–Collins' request. In August 1988, Ruby–Collins presented the City with a detailed claim for costs incurred in performing this averred extra work. The City subsequently rejected Ruby–Collins' claim.

After the City rejected Ruby–Collins' claim for additional compensation, Ruby–Collins brought this lawsuit. Ruby–Collins has not alleged that the City breached the construction contract. Ruby–Collins, instead, seeks recovery solely under the theory of equitable adjustment.

### B. The Contract Between Ruby–Collins and the City

HDR prepared the Contract for the City. The Contract was composed of several different documents. Paragraph 5 of the June 9, 1986 Agreement executed by both parties defined the term "Contract Documents" to mean and include the following documents, among others:

(1) Information for Bidders;

(2) Bid;

(3) Agreement;

(4) General Conditions;

(5) Supplemental General Conditions; and

(6) Special Conditions as set out in Paragraph 2I of General Conditions.

Thus, by virtue of Paragraph 5, the Agreement became part of the Contract between Ruby–Collins and the City.

In the Agreement, Ruby–Collins agreed to begin and complete construction of the water main project. Paragraph 2 of the Agreement provides as follows:

The Contractor will furnish all of the materials, supplies, tools, equipment, labor, and other services necessary for the construction and completion of the Project described herein.

Paragraph 4 of the Agreement provides:

The Contractor agrees to perform all of the work described in the Contract Documents and comply with the terms therein ...

Several provisions from the Contract Documents are pertinent to the City's Motion for Summary Judgment.

The City distributed to interested bidders one of the Contract Documents, entitled "Information for Bidders," before accepting bids. Ruby–Collins received a copy of the Contract Document entitled "Information for Bidders." Paragraph 4 of "Information for Bidders" provides as follows:

4. GEOTECHNICAL INVESTIGATIONS

It shall be the Contractor's obligation to satisfy himself as to the nature, character, quality, and quantity of subsurface conditions likely to be encountered. Any reliance upon the geotechnical information made available by the Owner or the Engineer shall be at the Contractor's risk. The Contractor agrees that he shall neither have nor assert against the Owner or the Engineer any claim for damages for extra work or otherwise, or for relief from any obligations of this Contract based upon the failure by the Owner or the Engineer to obtain or to furnish additional subsurface information or to furnish all subsurface information in the Owner's or Engineer's possession or based upon any inadequacy or inaccuracy of the information furnished.

Certain subsurface information may be shown on separate sheets or otherwise

made available by the Owner or Engineer to Bidders, Contractors, and other interested parties. Neither such information nor the documents on which it may be shown shall be considered a part of the Contract Documents or Contract Drawings, it being understood that such information is made available only as convenience, without expressed or implied representation, assurance, or guarantee that the information is adequate, complete, or correct, or that it represents a true picture of the subsurface conditions to be encountered, or that all pertinent subsurface information in the possession of the Owner or Engineer has been furnished.

Any holder of Contract Documents will be permitted to make test borings, test pits, soundings, etc., on the site of the work if he so desires subject to his first obtaining approval from the Engineer and the N.C. Department of Transportation. It is understood that the party or parties receiving such approval must assume all risks and liabilities contingent thereto.

It shall be the obligation of the Contractor to inquire of the Owner and Engineer whether pertinent subsurface information has been obtained by the Owner with respect to the Work.

Paragraph 7 of "Information for Bidders" provides as follows:

### 7. BIDDER'S RESPONSIBILITY

Each Bidder is responsible for inspecting the site and for reading and being thoroughly familiar with the Contract Documents. The failure or omission of any Bidder to do any of the foregoing shall in no way relieve any Bidder from any obligation in respect to his Bid.

Bidders must satisfy themselves of the accuracy of the estimated quantities in the Bid Schedule by examination of the site and a review of the drawings and specifications including Addenda. After Bids have been submitted, the Bidder shall not assert that there was a misunderstanding concerning the quantities of Work or of the nature of the Work to be done.

The Contract between Ruby–Collins and the City also included a section entitled "GENERAL CONDITIONS." Several provisions contained within the "GENERAL CONDITIONS" section are relevant to the disposition of the City's Motion for Summary Judgment and provide in pertinent part as follows:

### 2. DEFINITIONS.

The following terms when used in the Contract Documents shall mean the following:

. . . . .

### L. FURNISH OR INSTALL OR PROVIDE OR SUPPLY.

Unless specifically limited in the context, the word "Furnish" or the word "Install" or the word "Provide" or the word "Supply" or any combination or similar directive or usage thereof, shall mean FURNISHING AND INCORPORATING IN THE WORK including all necessary labor, materials, equipment, and everything necessary to perform the Work indicated.

. . . . .

### BB. WORK.

All materials, supplies and equipment incorporated or to be incorporated into the construction and all labor, operations and services necessary to produce the construction, including in part all testing, obligations, duties and responsibilities necessary to the successful completion of the construction start up, and demonstration as required by the Contract Documents.

### 3. CONTRACTOR'S UNDERSTANDING.

A. It is understood and mutually agreed that by submitting a proposal the Contractor acknowledges that he has carefully examined all documents pertaining to the Work, the location, accessibility and general character of the site of the Work and all existing buildings and structures within and adjacent to the site, and has satisfied himself as to the nature of the Work, the condition of existing buildings and structures, the conformation of the

ground, the character, quality and quantity of the material to be encountered, the character of the equipment, machinery, plant, and any other facilities needed preliminary to and during prosecution of the Work, the general and local conditions, the construction hazards, and all other matters, including but not limited to the labor situation which can in any way affect the Work under the Contract. It is further mutually agreed that by submitting a proposal the Contractor acknowledges that he has satisfied himself as to the feasibility of the Contract Documents for the construction of the Work and that he accepts all the terms, conditions and stipulations contained therein; and that he is prepared to work in peace and harmony with other contractors performing work on the site.

22. COST INFORMATION.

Where a Contract is awarded on a lump sum basis, the Contractor shall file with the Architect–Engineer a balanced price segregation of his lump sum bid into items similar to the various subdivisions of the general and detailed specifications, the sum of which shall equal the lump sum bid. The cost of various materials shall be furnished upon request of the Architect–Engineer, and such data will then be used as a basis for making monthly estimates.

When a Contract is awarded on an estimated quantity-unit price basis, the unit price for the Work shall include costs for all labor, mechanics, superintendents, tools, materials, equipment and all utilities, transportation and services necessary to perform and complete said Work, and work incidental thereto, in a workmanlike manner, as described in the drawings, specifications and other Contract Documents. Work described in the Contract Documents but not identified in the listing of unit price items shall be considered incidental to unit price work listed and included as a part thereof, together with all contractor overhead and profit to accomplish the unlisted items.

42. MATERIALS, EQUIPMENT, SUPPLIES, SERVICES AND FACILITIES.

A. It is understood that, except as otherwise specifically stated in the Contract Documents, the Contractor shall provide and pay for all materials, labor, tools, equipment, supplies, machinery, equipment rental, water, heat, light, fuel, power, transportation, superintendence, temporary construction of every nature and all other services and facilities of every nature whatsoever necessary to execute, complete and deliver the Work in a workmanlike manner within the specified time.

45. CONTRACTOR'S RESPONSIBILITY, IN PART, UNDER THE CONTRACT DOCUMENTS.

The Contractor agrees that the following are the Contractor's responsibility, in part, under the Contract Documents:

.        .        .        .        .

C. The Contractor shall perform all Work and furnish all supplies, materials, machinery, equipment, mechanics, tools, plant, works, labor, transportation, superintendence, testing, facilities, services, means, methods, techniques, insurance and utilities, except as otherwise specified in the Contract Documents, necessary or proper to perform and complete all Work required by and in accordance with the Contract Documents and pay all taxes incidental to performing said Work and furnishing such items.

60. AUTHORITY OF ARCHITECT–ENGINEER.

B. The Architect–Engineer shall determine the amount, quality, acceptability, and fitness of the several kinds of Work, materials, equipment and supplies which are to be paid for under the Contract and shall decide questions which may arise in relation to said Work and its compliance with the Contract Documents. The Architect–Engineer's estimates and decisions shall be final and conclusive, except as other-

wise expressly provided. In case any question shall arise between the parties to the Contract relative to the Contract Documents, the determination or decision of the Architect–Engineer shall be a condition precedent to the right of the Contractor to receive any money or payment for Work under the Contract affected in any manner or to any extent by such question.

C. The Architect–Engineer shall decide the meaning and intent of any portion of the Contract Documents where the same may be found obscure or be in dispute.

84. OWNER'S REMEDIES CUMULATIVE AND NONWAIVER.

No right or remedy conferred upon or reserved to the Owner by the Contract shall be considered exclusive of any other remedy or contractual right, but the same shall be distinct, separate and cumulative, and shall be in addition to every other remedy existing at law or in equity or by statute; and every remedy given by the Contract to the Owner may be exercised from time to time as often as the occasion may arise, or as may be deemed expedient. No delay or omission on the part of the Owner to exercise any right or remedy arising from any default on the part of the Contractor shall impair any such right or remedy or shall be construed to be a waiver of any such default or any acquiescence thereto, or otherwise affect the right of the Owner to enforce the same in the event of any subsequent breach or default by the Contractor.

The Contract between Ruby–Collins and the City also includes a section entitled "SECTION 01060 SPECIAL CONDITIONS," which contains several provisions relevant to the disposition of the City's Motion for Summary Judgment. The relevant provisions provide in pertinent part as follows:

1.01  SUMMARY OF WORK

Contracts for pipe installation include furnishing and installing 54″ ductile iron or prestressed concrete cylinder pipe with all appurtenances, and supplying all materials, equipment, and labor for the completed installation.

1.17  SUBSURFACE INVESTIGATION

A. Subsurface Conditions. Soils and Materials Engineers, Charlotte, North Carolina, conducted subsurface investigations along the route of the water line. Copies of the report are on file at the offices of the Charlotte/Mecklenburg Utility Department; HDR Infrastructure, Inc. of North Carolina, and at Soils and Materials Engineers.

B. Soil borings are available for general information. The borings are not guaranteed, nor are they a part of the Contract Documents. It shall be the Contractor's sole responsibility to identify site conditions and completely perform the Contract in a proper and safe manner.

The Contract between Ruby–Collins and the City also included a section entitled "SECTION 01063 MEASUREMENT AND PAYMENT," which contains several provisions relevant to the disposition of the City's Motion for Summary Judgment. The relevant provisions in "SECTION 01063 MEASUREMENT AND PAYMENT" provide in pertinent part as follows:

1.02  GENERAL

The total bid price shall cover all work required by the Contract Documents. All costs in connection with the proper and successful completion of the work, including furnishing all materials, equipment, supplies, and appurtenances; providing all construction plans, equipment, and tools; and performing all necessary labor and supervision to fully complete the work, shall be included in the unit and lump sum prices bid. All work not specifically set forth as to pay item in the Bid Form shall be considered subsidiary obligations of Contractor and all costs in connection therewith shall be included in the prices bid.

1.04 MEASUREMENT AND PAY-MENT–UNIT PRICE ITEMS

A. 54–Inch Water Pipe.

. . . . .

2. The unit price bid per lineal foot for the construction of the pipeline shall include all of the Contractor's cost for the complete construction of the pipeline, exclusive of items provided for elsewhere in the Bid Form.

3. The price bid shall include: furnishing, transporting, and installing all pipe and materials; furnishing and installing fittings or specials including bulkheads and outlets not otherwise provided for in the Bid Form; joints and jointing materials; bracing, shoring, and sheeting; excavation, including exploratory excavation; constructing the specified bedding; backfilling (except for those classified backfill material items otherwise provided for in the Bid Form); method of backfill and compaction as specified; protection and adjusting of aboveground and underground utilities and service connections (except those specifically listed separately in the Bid Form); testing; inspection; disinfection; and all other related and necessary materials, work, and equipment required to construct a complete operable pipeline in accordance with the Contract Documents.

The Contract between Ruby–Collins and the City also included a section entitled "SECTION 02221 TRENCHING, BACKFILLING AND COMPACTING FOR UTILITIES," which contains several provisions relevant to the disposition of the City's Motion for Summary Judgment. The relevant provisions in "SECTION 02221 TRENCHING, BACKFILLING AND COMPACTING FOR UTILITIES" provide in pertinent part as follows:

PART 1—GENERAL

1.01 DESCRIPTION

A. General:

1. Furnish all labor, materials, tools, equipment, and services for excavation, trenching, backfilling and compacting for all underground utilities, as indicated, in accord with provisions of Contract Documents.

PART 2—PRODUCTS

2.01 MATERIALS

A. Backfill material: As approved by Engineer.

1. Free of rock cobbles, roots, sod or other organic matter, and frozen material.

PART 3—EXECUTION

3.01 GENERAL

A. Remove and dispose unsuitable materials to site approved by Owner.

3.04 BACKFILLING

A. Methods: Provide backfill and compaction methods of following types:

1. Carefully compacted backfill. Furnish carefully compacted backfill where indicated on drawings and specified for trench embedment conditions and for compacted backfill conditions up to 12 IN above top of pipe or conduit. Comply with the following:

a. Place backfill in lifts not exceeding 8 IN (loose thickness).

b. Hand place, shovel slice, and pneumatically tamp all carefully compacted backfill.

c. Observe specific pipe or conduit manufacturer's recommendations regarding methods of backfilling and compaction.

d. Insure compaction of each lift to requirements stated in these specifications.

2. Common trench backfill. Perform remaining backfill in accordance with the following:

a. Place backfill in lift thicknesses capable of being compacted to densities specified.

b. Observe specific pipe or conduit manufacturer's recommendations regarding methods of backfilling and compactions.

c. Exercise extreme care in backfilling operations to avoid displacing joints and appurtenances or causing any horizontal or vertical misalignment, separation, or distortion. Repair damages, distortions or misalignments to full satisfaction of Engineer.

3.06 FIELD QUALITY CONTROL

A. Testing:

1. Inplace moisture density tests are the responsibility of the Engineer. Where backfill compaction does not meet moisture density test requirements and after backfill has been removed as directed by Engineer and situation corrected, perform additional tests as directed until compaction meets or exceeds requirements.

2. Reference to Engineer in this section will imply Soils Engineer when employed by Owner and directed by Engineer to undertake necessary inspections as approvals as necessary.

The Contract between Ruby–Collins and the City also included a section entitled "SECTION 02502 CONCRETE PAVEMENT," which contains several provisions relevant to the disposition of the City's Motion for Summary Judgment. The relevant provisions in "SECTION 02502 CONCRETE PAVEMENT" provide in pertinent part as follows.

PART 3—EXECUTION

3.01 GENERAL

A. Preparation of subgrade:

1. Prepare subgrade with methods, procedures, awnd [sic] equipment necessary to attain required compaction densities.

.    .    .    .    .

3. Remove soft or spongy areas. Replace with acceptable material.

*Required Compaction Density*

For Cohesive Soils 100 percent AASH-TO T99

4. Insure moisture content is within limits prescribed to achieve required compaction density.

The above-quoted provisions all are part of the Contract between Ruby–Collins and the City.

*C. The SME Report*

The SME Report, however, is not part of the Contract between Ruby–Collins and the City. First, Paragraph 5 of the June 9, 1986 Agreement executed by Ruby–Collins and the City specifically did not include the SME Report in the list of Contract Doc-

uments. And, second, Paragraph 4 of the section entitled "Information for Bidders" specifically informed potential bidders that subsurface information made available by the City was not considered part of the Contract.

The purpose of the SME Report, according to page 1 of the SME Report, was as follows:

1. To evaluate the subsurface conditions along the route of the pipeline, including soil and groundwater conditions;

2. To develop concepts for design and construction of the open-cut trench excavations, paying particular attention to any shoring, dewatering or any other safety considerations that may be required during installation of the pipeline;

3. To develop recommendations relative to foundation design and construction considerations for the value vaults (to be supplied in a subsequent report when design information becomes available);

4. To provide design and construction guidance concerning backfill placement and compaction requirements within roadway areas;

5. To provide pavement replacement design recommendations (to be provided when design parameters are supplied by CDOT); and

6. To present general recommendations concerning construction procedures as they relate to soils.

On page 2 of the SME Report, SME described the number of, and the method of determining the locations of, the borings made in preparing the SME Report as follows:

The borings were located in the field by an engineer from our office. The locations were chosen based on a spacing of about 1000 feet, beginning near the intersection of Vanizer and Thrift Roads in the northwest and continuing generally in a southeasterly direction to the intersection of Providence and Sharon Amity Roads. Additional borings were performed at areas of creeks, tunnel locations, major changes in ground surface elevation, and changes in route direction.

Many of the locations of the soil borings conducted within major roadways were dictated by the presence of overhead and underground utilities. Where possible, soil borings were performed on side streets adjacent to the major roadways in order not to block traffic.

Throughout the SME Report in a number of places, SME referred to "moist," "damp," or "wet" soils, to groundwater, and to "alluvial" soils or deposits or "alluvium." The following list itemizes those references by page number.

| Page | References |
|------|-----------|
| 4 | "The general subsurface conditions as indicated by our borings generally consist of either pavement, top soil, existing fill and/or alluvial soils underlain by residual soils." |
| 5 | "[S]tream-deposited alluvial layer consisting of a medium dense gray wet fine to coarse sand...." |
| | "Water measurements ... indicated the water table to be at a depth of 8.7 feet...." |
| | "Water was measured in this boring at 11.5 feet...." |
| | "Groundwater was measured ... to be at a depth 11.4 feet...." |
| 6 | "Underlying the pavement, alluvial deposits consisting of either soft to firm dark brown moist fine sandy silty clay ..., very loose dark gray slightly silty clayey fine sand ... or loose dark gray slightly silty fine to coarse wet sand ... were encountered." |
| | "Water was measured at a depth of 12 feet...." |
| | "Water was measured ... at a depth of 15 feet...." |
| 8 | "[G]roundwater was measured to be at a depth fo [sic] 12.8 feet...." |
| 9 | "Water was measured to be at a depth of 11.5 feet...." |
| | "[A] firm light tan and pinkish orangish brown moist fine to coarse sandy silt was encountered...." |
| 10 | "[T]he sample of soil obtained at 13½ feet was damp, and the next sample obtained at 18½ feet was noted to be moist." |
| 12 | "[A]lluvium is present which consists of a very soft dark gray wet |

| Page | References |
|------|-----------|
| | slightly clayey fine to medium sandy silt...." |
| | "[A] 11½ foot thick deposit of alluvium which consists of very loose to loose light gray fine to coarse wet sand was encountered." |
| | "Water was measured ... at a depth of 12 feet ... and at a depth of 9 feet...." |
| | "From 7 to 12 feet, alluvium ... is present." |
| 14 | "Underlying this upper fill deposit, alluvium is present to the 19 foot depth." |
| | "[I]t is possible that very soft layers may exist in this alluvial deposit." |
| | "Water was measured at a depth of 16 feet...." |
| | "At the 13–foot–depth, an alluvial deposit ... was encountered." |
| 15 | "[W]ater was measured at a depth of 8.7 feet...." |
| | "[W]ater was noted ... at a depth of 18 feet ... and at a depth of 16.7 feet...." |
| 16 | "[G]roundwater was noted at a depth of 18.6 feet...." |
| | "Groundwater was measured ... at a depth of 18 feet...." |

As acknowledged by Mr. Morgan in his deposition, however, the SME Report did not contain any specific information on the moisture content of the soils.

On page 16 of the SME Report, SME advised readers about the water level readings as follows:

Water level readings were made in the soil borings at times as shown on the logs. However, fluctuations in the level of the ground water may occur due to variations in rainfall, temperature and other factors not evident at the time measurements were made and reported herein.

On page 21 of the SME Report, SME advised readers of certain construction considerations as follows:

Due to the wide spacing of the soil borings, it is probable that variations in the soil conditions will be encountered during installation of the pipeline. In order to permit correlation between the

soil boring data and the actual soil conditions encountered during construction, it is recommended that competent geotechnical engineers familiar with the local soil conditions be retained to perform construction monitoring and testing during construction of the soils-related phases of the work.

On page 22 of the SME Report, SME informed readers about the soil encountered in its subsurface investigation as follows:

> Soils removed from the excavations are considered suitable as backfill material, with the exception of topsoil or other highly organic soils. However, in areas where plastic silty clays are encountered, these soils should not be used as backfill in the top two feet beneath pavements. The need for some drying of the soils may be necessary before they can be placed and compacted to the specified density. It is possible that as excavations approach the groundwater level, the moisture condition in the soil may become such that it becomes prohibitive for use as structural fill.

> Topsoil and other moderately organic materials can be used as backfill in landscaped areas. Alluvial soils and materials that will result in some significant decay such as stumps and trees, etc. should not be placed in the trench excavations but should be otherwise disposed of.

> .  .  .  .  .

> It is also possible that some seepage from water bearing previous seams located at shallow depth may occur. It is anticipated that any such seepage could be handled by de-watering methods such as pumping from sumps.

The City provided copies of the SME Report to potential bidders upon request.

## III. THE COURT'S STANDARD FOR SUMMARY JUDGMENT

■ The Court's standard for considering motions for summary judgment is clear. Summary judgment is appropriate when the pleadings, responses to discovery, and the record reveal that no genuine issue of any material fact exists and that the moving party is entitled to judgment as a matter of law. F.R.Civ.P. 56(c). The party moving for summary judgment has the initial burden of showing that no genuine issue of any material fact exists and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). After the moving party has met its burden, the non-moving party must come forward with specific facts showing that evidence exists to support its claims and that a genuine issue for trial exists. *Id.; Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *see* F.R.Civ.P. 56(e) (in response to motion for summary judgment, "adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial"). When considering motions for summary judgment, courts must view facts and inferences from the facts in the light most favorable to the party opposing the motion for summary judgment. *Matsushita*, 475 U.S. at 587–88, 106 S.Ct. at 1356–57; *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). When, however, the evidence from the entire record could not lead a rational fact-finder to find for the non-moving party, no genuine issue for trial exists and summary judgment is appropriate. *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356.

## IV. DISCUSSION

To support its Motion for Summary Judgment, the City argues, first, that the Contract Documents clearly require Ruby–Collins to perform the necessary backfill work, including providing any materials needed to complete such work, as part of its unit price bid for installing the water main. Ruby–Collins argues, on the other hand, that by encountering conditions which substantially changed the nature of the work performed and which were not

contemplated by either Ruby–Collins or the City, it is entitled to an equitable adjustment to the Contract. Ruby–Collins argues, further, that the absence of a changed conditions clause in the contract does not preclude an equitable adjustment to the Contract. Ruby–Collins argues, moreover, that the extra work provisions of the Contract authorize an equitable adjustment.

■ The Court carefully has considered the parties' contentions and the applicable law. The Court believes that the evidence now in the record could lead a rational fact-finder to only one conclusion: The clear language of the Contract Documents executed by Ruby–Collins and the City disclose that the Contract encompassed the work for which Ruby–Collins now seeks an equitable adjustment. The Court concludes, therefore, that no genuine issue for trial exists and that summary judgment in the City's favor is appropriate.

### A. The Language of the Contract

Quite simply, Ruby–Collins agreed to begin and complete construction of the water main through Charlotte. As part of its Contract with the City, Ruby–Collins agreed to provide backfill, which met the specifications of the section entitled "SECTION 02221 TRENCHING, BACKFILLING AND COMPACTING FOR UTILITIES." The Contract clearly and unambiguously required Ruby–Collins to make its own investigation to determine whether the excavated soil was suitable for use as backfill. The Contract plainly placed the obligation of performing a subsurface investigation on the contractor, Ruby–Collins. Ruby–Collins' assumption that the material excavated in digging the trench for the water main was suitable for use as backfill was a risk that it took in accepting the City's award of the water main project to it. Several provisions in the Contract lead inescapably to this result.

The City, through its retained engineer, HDR, provided interested bidders, including Ruby–Collins, with a document entitled "Information for Bidders" and with the SME Report. Ruby–Collins reviewed the "Information for Bidders" and the SME Report.

Paragraph 4 of the "Information for Bidders" entitled "GEOTECHNICAL INVESTIGATIONS" essentially placed the burden on the contractor, Ruby–Collins, to satisfy itself of the nature, character, quality, and quantity of subsurface conditions to be encountered. Paragraph 4 also advised the contractor that reliance upon the geotechnical information provided by the City or HDR was at the contractor's own risk. Paragraph 4 additionally advised the contractor that any subsurface information provided by the City or HDR, that is, the SME Report, was not a part of the Contract, but was provided for the contractor's convenience. Paragraph 4 further warned the contractor that the subsurface information was provided without expressed or implied representation, assurance, or guarantee that the information was adequate, complete, or correct.

Paragraph 7 of the "Information for Bidders" entitled "BIDDER'S RESPONSIBILITY" imposed on the contractor the responsibility of inspecting the site and reading and familiarizing itself with the Contract Documents. Paragraph 7 also warned the contractor that after the City accepted a bid, the contractor could not assert the existence of a misunderstanding concerning the quantities of work or the nature of the work to be performed based on any inadequacy or error in information furnished by the City or HDR.

On June 9, 1986, the City and Ruby–Collins executed an Agreement. Paragraph 5 of the Agreement defined the term "Contract Documents" to include, among other things, the City's document entitled "Information for Bidders," the Bid, the June 9, 1986 Agreement itself, the document entitled "GENERAL CONDITIONS," and the document entitled "SPECIAL CONDITIONS." In the Agreement, Ruby–Collins acknowledged that it carefully had examined all of the Contract Documents pertaining to the work and agreed to perform all of the work described in the Contract Documents and comply with their terms for the

specified amount, that is, its accepted bid of $11.5 million.

In Paragraph 2 of the Agreement, Ruby–Collins agreed to furnish all of the materials, supplies, tools, equipment, labor, and other services necessary for the construction and completion of the water main. Paragraph 2(L) of the section entitled "GENERAL CONDITIONS" defined the term "furnish" to mean the furnishing and incorporating in the work all necessary labor, materials, equipment and everything necessary to perform the work indicated. Paragraph 1.02 of the section entitled "SECTION 01063 MEASUREMENT AND PAYMENT" provided that the total bid price covered all work required by the Contract Documents and all costs in connection with the proper completion of the work, including the furnishing of materials. Paragraph 1.02 provided, further, that all work not specifically set forth as a pay item in the contractor's bid would be considered subsidiary obligations of the contractor and all costs in connection with the unspecified item would be included in the prices bid.

Paragraph 3A of the section entitled "GENERAL CONDITIONS" provided that Ruby–Collins carefully had examined all documents relating to the work. Paragraph 3A provided, further, that Ruby–Collins understood and mutually agreed, among other things, that it had satisfied itself as to the nature of the work, the quality and quantity of the material to be encountered, and all other matters.

Paragraph 1.17B of the section entitled "SPECIAL CONDITIONS" provided that soil borings provided by HDR were available for Ruby–Collins' general information, were not guaranteed, and were not part of the Contract Documents. Paragraph 1.17B provided, further, that it was Ruby–Collins' sole responsibility to identify site conditions and to completely perform the Contract in a proper and safe manner.

According to its very terms, the SME Report's purpose was to evaluate the subsurface conditions along the route of the pipeline, including soil and ground water conditions, and to provide design and construction guidance concerning backfill placement and compaction requirements within roadway areas. The SME Report, however, cautioned on pages 21 and 22 that due to the wide spacing of the soil borings, it was probable that variations in the soil conditions would be encountered during the installation of the pipeline. Although the SME Report noted that soils removed from the excavations were considered suitable for backfill, the SME Report forewarned of the need to dry soil before it would meet the compaction requirement of the Contract and of the possibility that moisture condition of the soil might prohibit the soil's use as structural backfill.

The Contract, however, did not provide certain things. The Contract neither specified from where Ruby–Collins should obtain the backfill nor set forth backfill as a specific pay item in the contractor's bid. Thus, the contractor had the responsibility to include an item, such as additional backfill material, as a specific pay item. Further, the Contract neither specified in any provision the condition of the soil through which the pipeline needed to be laid nor represented that the soil was suitable or unsuitable for use as backfill. Thus, the contractor had the responsibility to furnish suitable backfill and to determine the source of the backfill. Moreover, the Contract did not contain a changed conditions clause providing for increased payments to Ruby–Collins for unexpected site conditions, changed conditions, or differing site conditions.

### B. Ruby–Collins' Contentions in Opposing the City's Motion for Summary Judgment

In addition to the clear language of the Contract favoring the position advanced by the City, Ruby–Collins' contentions advanced in response to the City's Motion for Summary Judgment are without merit. Ruby–Collins has not provided this Court with controlling, or even persuasive, authority to support its contentions.

Ruby–Collins contended, first, that when a contractor encounters conditions which were not originally contemplated by either

party and which substantially change the nature of the work performed, the law permits an equitable adjustment to the Contract. The Court disagrees with Ruby–Collins' first contention.

Quite simply, no changed conditions substantially changing the nature of the work existed. The Contract required Ruby–Collins to backfill the water main trench and to obtain approval from the project's engineer of the backfill material. The Contract did not specify the source of the backfill material, but only required the backfill material to meet certain specifications, including moisture content. Moreover, the Contract did not require Ruby–Collins to use, nor did the Contract prohibit Ruby–Collins from using, the newly excavated soil as backfill material.

In arguing that an equitable adjustment to the Contract is permitted because of changed conditions not originally contemplated by the parties and changing substantially the nature of the work, Ruby–Collins has cited *Davidson & Jones, Inc. v. North Carolina Dep't of Admin.*, a construction case decided by the North Carolina Supreme Court. *See Davidson & Jones, Inc. v. North Carolina Dep't of Admin.*, 315 N.C. 144, 337 S.E.2d 463 (1985). In *Davidson*, the owner of the construction project provided potential bidders with bidding information. *Id.*, 337 S.E.2d at 464. The bidding information was part of the construction contract and contained a clause, the "rock clause," instructing the bidder to include 800 cubic yards of rock excavation in its base bid. *Id.* The "rock clause" in the bidding information provided as follows:

0230  Rock Excavation:

Material to be excavated is assumed to be earth and materials that can be removed with hand tools. If rock is encountered within limits of excavation, adjustments will be made in Contract on basis of unit price stated in Form of Proposal for all rock removed above or below these quantities:

1. The General Contractor shall include *800* cubic yards of rock excavation in his base bid.

*Id.* at 468. During performance of the contract, however, the contractor needed to excavate 3714 cubic yards of rock. *Id.* at 464. The trial court permitted the contractor to recover, among other things, payment at the unit bid price for all rock excavated because of the parties' mutual mistake regarding the conditions to be encountered at a construction project and payment for duration-related expenses associated with the additional excavation. *Id.* at 465. On appeal, the North Carolina Court of Appeals affirmed the trial court's award of payment at the unit bid price for all rock excavated, but reversed the trial court's award of duration-related expenses. *Id.* The parties did not appeal the Court of Appeals' affirmance of the award for all of the rock excavated. *Id.* at 467. The contractor, however, did appeal the Court of Appeals' denial of the award of duration-related expenses. *Id.* at 467–70. On appeal, the North Carolina Supreme Court permitted the contractor to receive payment for duration-related expenses incurred because of the parties' mutual mistake regarding the conditions to be encountered at a construction project and allowed an equitable adjustment to the contract under the specific contractual changed conditions clause and in the interest of fairness. *Id.* at 469–70.

The Court believes that the facts in *Davidson* are clearly and easily distinguishable from the facts before this Court and concludes, therefore, that the *Davidson* decision is not persuasive authority. In the case at bar, the Contract did not contain a clause providing for extra pay if Ruby–Collins needed to dry the backfill material, if Ruby–Collins immediately could not use the newly excavated material, or if Ruby–Collins needed to abandon its "cut and cover" method and haul other backfill material to the site. Moreover, Ruby–Collins did not allege, and no evidence exists to support a finding of, mutual mistake or the City's breach of any of the Contract's provisions regarding backfill. Furthermore, contrary to Ruby–Collins' contentions that it relied on the SME Report and that the SME Report failed to reveal water or moisture problems, the Contract Doc-

uments clearly provided that contractors should not rely on the SME Report or other subsurface information made available by the City and that any such reliance by the contractor would be at the contractor's own risk. The Contract Documents additionally warned the contractor that the City was providing the subsurface information as a convenience to the contractor and that the subsurface information was not a guarantee. The Contract Documents also clearly excluded from the Contract the subsurface information and the documents in which the subsurface information was revealed.

Ruby–Collins also has argued that it is entitled to an equitable adjustment to the Contract under the Contract's extra work section because the unanticipated conditions changed the nature of the work performed to the extent that the work essentially became new work not originally included in the Contract. To support this argument, Ruby–Collins has cited the North Carolina Court of Appeals decision of *S.J. Groves & Sons and Co. v. State.* See *S.J. Groves & Sons and Co. v. State,* 50 N.C.App. 1, 273 S.E.2d 465 (1980). In *Groves,* a contractor requested information concerning the subsurface conditions to be encountered during excavation of a construction site. *Id.,* 273 S.E.2d at 466. The owner of the site furnished the contractor with the requested information. *Id.* The information was part of the contract documents. *Id.* at 469. The information advised the contractor that unclassified excavation in excess of 4 million yards would be suitable and practicable material for use in constructing an embankment. *Id.* at 473. The contractor then used the unclassified excavation in constructing the embankment. *Id.* at 473–77. The information provided by the owner to the contractor, however, was erroneous. *Id.* at 473. The embankment suffered "cave-ins" or "slides," which necessitated the redesign of the segment of the project and its eventual cancellation. *Id.* at 478–81. The contract between the parties provided in pertinent part as follows:

Should the Contractor encounter or the Commission discover during the progress of the work *conditions at the site differ-*

*ing materially from those indicated in the contract,* which conditions could not have been discovered by reasonable examination of the site, the Engineer shall be promptly notified in writing of such conditions before they are disturbed. The Engineer will thereupon promptly investigate the conditions and if he finds they do so materially differ and cause a material increase or decrease in the cost of performance of the contract, an equitable adjustment will be made and a supplemental agreement entered into accordingly.

*Id.* at 471 (emphasis in original). The trial court in *Groves* concluded that the information concerning subsurface conditions provided by the owner was material, that the contractor reasonably relied on the information provided by the owner and conducted its own, reasonable on-site investigation. *Id.* at 489–90. Because of the contractor's reliance on the information and the provision in the contract, the trial court in *Groves* allowed an equitable adjustment to the contract. *Id.* at 490–91. On appeal, the North Carolina Court of Appeals affirmed the trial court's decision. *Id.* at 501.

Once again, the facts in the case before this Court are clearly and easily distinguishable from the facts in the case cited by Ruby–Collins. The Contract *sub judice* did not contain a clause similar to the clause in the contract in *Groves.* Additionally, the Contract Documents in the case before this Court specifically provided that the reports of subsurface conditions were not part of the Contract Documents.

Ruby–Collins also has contended that it is entitled to recover because of mutual mistake. Ruby–Collins cites the North Carolina Court of Appeals decision of *Ray D. Lowder, Inc. v. North Carolina State Highway Comm'n* to support its contention. See *Ray D. Lowder Inc. v. North Carolina State Highway Comm'n,* 26 N.C. App. 622, 217 S.E.2d 682, *cert. denied,* 288 N.C. 393, 218 S.E.2d 467 (1975). Ruby–Collins argues that a contractor can receive payment for expenses incurred because of a mutual mistake as to conditions to be encountered at a construction project. *Id.,*

217 S.E.2d at 696. Ruby–Collins argues, further, that if authorized in specific contractual changed condition clauses or if necessary in the interest of fairness, equitable adjustments to contracts are appropriate when both parties to a contract fail to anticipate a condition which, when encountered, materially changes the nature of the job.

■ Two major flaws exist to prevent Ruby–Collins from prevailing on this contention. First, Ruby–Collins failed to allege in the Complaint the theory of mutual mistake. In the Complaint, Ruby–Collins did not allege any mistake on the part of the City. Ruby–Collins, instead, alleged only that it based its bid for the water main project in part on its own reasonable belief that the soil under the paved streets along the water main project route was similar to, and had the same moisture content as, the soil actually tested during its pre-bid investigation. The Court believes that these allegations do not constitute sufficient allegations of mutual mistake.

And, second, the Court believes that the *Lowder* decision is distinguishable from the case before this Court and, therefore, is not persuasive or controlling authority. In *Lowder*, in performing an undercut excavation, a contractor incurred a large cost overrun occasioned by unexpected and excessive wetness. *Id.* 217 S.E.2d at 683. The contract contained itemized proposals, one of which called for the removal of 12,000 cubic yards of undercut excavation. *Id.* A changed condition provision in the contract provided in pertinent part as follows:

> If the actual quantity of any major contract item overruns or underruns the original bid quantity by more than 15 percent of such original bid quantity, an increase or decrease in the contract unit price may be authorized by the Engineer in accordance with these provisions.

*Id.* at 694. In *Lowder*, the contractor actually removed 259,729 cubic yards of undercut excavation. *Id.* at 683. Because of the contractual changed condition provision, the trial court in *Lowder* allowed the contractor to prevail in its attempt to obtain additional compensation. *Id.* at 684. On appeal, the North Carolina Court of Appeals reversed the trial court's decision and remanded the matter for a new trial because of evidentiary issues. *Id.* at 701. The *Lowder* court acknowledged, however, that the itemized proposal referring to the quantity of undercut excavation could constitute a material representation upon which a contractor justifiably could rely. *Id.* at 695. The court in *Lowder* then recognized that when confronted by conditions differing significantly from the conditions indicated to exist in the contract, a contractor legitimately could seek relief under a contractual "changed conditions" provision. *Id.* at 696.

■ In the case before this Court, however, the Contract did not contain a "changed conditions" clause or any clause similar to the clause contained in the contract in *Lowder*. Moreover, in the case *sub judice*, there was no underrun or overrun during the performance of the Contract. The Contract clearly required Ruby–Collins to backfill the pipeline trench. Ruby–Collins attempted to use the "cut and cover" method and use excavated soil immediately as backfill material. Ruby–Collins soon realized that a method other than the one it anticipated using would be necessary to complete performance according to the Contract's specifications. Thus, even if Ruby–Collins had alleged the theory of mutual mistake, no evidence exists to indicate that the City in any way was mistaken. The Contract Documents clearly place the burden of determining the subsurface conditions on the contractor. Thus, if any mistake existed, the mistake was that of Ruby–Collins and Ruby–Collins alone.

■ Ruby–Collins has argued, second, that even though the Contract does not contain a changed conditions clause, it is entitled to an equitable adjustment to the Contract. To support its argument, Ruby–Collins has cited the Court to the recent North Carolina Court of Appeals decision in *Thompson–Arthur Paving Co. v. North Carolina Dep't of Transp. See Thompson–Arthur Paving Co. v. North Carolina Dep't of Transp.*, 97 N.C.App. 92, 387

S.E.2d 72 (1990). The Court is unable to ascertain the reason that Ruby–Collins cited *Thompson–Arthur* for authority to support its argument. In considering whether to allow a contractor to receive additional compensation, the *Thompson–Arthur* court specifically stated as follows:

> Plaintiff asserts that it is due an equitable adjustment to allow recovery of the extra costs incurred because of the underrun. Plaintiff relies primarily on our decisions in *Lowder* ... and [*Groves*]. This reliance is misplaced, however, because in both of those cases equitable adjustments were available under "changed conditions" clauses in the underlying contracts. The "changed conditions" clause was deleted from the contracts for the projects at issue here. Therefore, an award of additional compensation based on "changed conditions" is unavailable to plaintiff in these cases.... When the language is clear and unambiguous the court must construe the contract as written.

*Id.*, 387 S.E.2d at 73–74 (citations omitted). Thus, the case law cited by Ruby–Collins does not support its argument. In accordance with the *Thompson–Arthur* precedent, this Court must construe the Contract as written. The absence of a changed conditions clause, therefore, precludes this Court from awarding Ruby–Collins additional compensation for changed conditions.

Ruby–Collins argues, third, that the extra work provision of the Contract entitles it to an equitable adjustment to the Contract. To support this argument, Ruby–Collins stated in its Response to Defendant's Motion for Summary Judgment as follows:

> The contract also contains many provisions which bolster Ruby–Collins' contention that it was not required to supply all the common backfill material.... Ruby–Collins did not anticipate providing general backfill material and was forced to use unexpected and less efficient methods of backfilling in order to try to maintain its anticipated production rate....

Ruby–Collins, however, fails to cite one section of the Contract Documents to support that statement. As far as this Court can determine, the Contract Documents do not contain such a section.

The United States Supreme Court, however, has provided the Court with guidance in treating cases involving "lump sum" or "fixed sum" contracts. *See United States v. Spearin*, 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918). In *United States v. Spearin*, the Supreme Court stated as follows:

> The general rules of law ... are well settled. Where one agrees to do, for a fixed sum, a thing possible to be performed, he will not be excused or become entitled to additional compensation, because unforeseen difficulties are encountered.

*Id.* at 136–37, 39 S.Ct. at 61 (citations omitted).

Additionally, in resolving a dispute between a contractor and the owner of a construction project involving claims for additional compensation, another federal district court has stated as follows:

> It is an elementary principle of contract law that in order to recover for "extras", [sic] (the contractor) must show that they are in fact extras. Extra or additional work is work not contemplated in the original specifications. When the work performed is covered under the lump sum contract, the contractor cannot consider the cost of performance as an extra. In a fixed-sum contract, a contractor is not entitled to additional compensation simply because unforeseen difficulties are encountered.

*Anderson v. Golden*, 569 F.Supp. 122, 142 (S.D.Ga.1982).

Based on this guidance, the Court believes that when Ruby–Collins bid on the water main project for a specified sum of money, that is, its bid, Ruby–Collins assumed a risk that it would be able to perform the Contract for the amount of the bid. And, all of the Contract Documents placed the burden on Ruby–Collins to satisfy itself of the nature of the work to be encountered. No evidence exists to show

that a party other than Ruby–Collins was to assume the risk of performance. Thus, even though the cost of performance and the cost of complying with the Contract's specifications exceeded the anticipated cost, Ruby–Collins has no choice but to bear the burden of the additional cost. *See id.* In short, he who derives the advantage of winning a contract bid also must sustain the burden. In this case, Ruby–Collins simply planned to employ "the cut and cover" method using a conveyor belt, but eventually had to use an alternative method, which cost more, to complete performance. In this case, Ruby–Collins, rather than the City, must bear the cost associated with using the alternative method.

## V. SUMMARY, CONCLUSION, AND ORDER

In this dispute involving the construction of a water main in Charlotte, the City is entitled to the entry of summary judgment in its favor. No genuine disputes of material fact exist to preclude the grant of summary judgment. The entire record now before this Court would lead a rational fact-finder to conclude only that the work for which Ruby–Collins seeks an equitable adjustment to the Contract is work covered by the original Contract.

Because the Court has determined that Ruby–Collins is not entitled to an equitable adjustment to the Contract, the Court finds it unnecessary to consider the second and third grounds advanced to support the City's Motion for Summary Judgment. Because of the disposition of the City's Motion for Summary Judgment, the Court also finds it unnecessary to consider the City's Motion to Amend Answer, filed February 26, 1990 and Ruby–Collins' Motion to Amend Complaint, filed March 6, 1990.

The Court will file simultaneously with this Memorandum of Decision, a Judgment in favor of the City.

NOW, THEREFORE, IT IS ORDERED that (1) the City's Motion for Summary Judgment be, and hereby is, GRANTED; (2) Ruby–Collins shall have and recover nothing of the City; and (3) Ruby–Collins'

Complaint be, and hereby is, DISMISSED WITH PREJUDICE.